Bruce L. STOUT et al., Plaintiffs,

v.

Charles O. HENDRICKS, Secretary of State of the State of Indiana, et al., Defendants.

Nelson G. GRILLS, Plaintiff,

v.

Matthew E. WELSH, Governor of Indiana, et al., as Members of the State Election Board, Defendants.

Nos. IP 61–C–236, 62–C–326.

United States District Court
S. D. Indiana,
Indianapolis Division.

Nov. 8, 1963.

As Corrected April 20, 1964.

Robert D. Risch, Jerome M. Strauss, and John Wood, Indianapolis, Ind., for plaintiffs in Stout case.

Nelson Grills, Indianapolis, Ind., pro se.

Edwin K. Steers, Atty. Gen. of Indiana, Indianapolis, Ind., for defendants in both cases.

Before KILEY, Circuit Judge, and STECKLER and HOLDER, District Judges.

KILEY, Circuit Judge:

This is a three-judge court composed pursuant to 28 U.S.C. § 2284 as required by 28 U.S.C. § 2281 at the request of the District Court. The Court has before it two actions: Bruce L. Stout, et al. v. Charles O. Hendricks, Secretary of State of the State of Indiana, et al., filed August 2, 1961, and Nelson G. Grills v. Matthew E. Welsh, Governor of Indiana, et al., filed August 7, 1962. The actions were consolidated as to all proceedings and for trial of all matters in issue by the Court upon its own motion on November 27, 1962. Each action relates to the apportionment of the legislative branch of government of the State of Indiana.

The first action is a class action brought by the plaintiffs, Bruce L. Stout, John E. Hunter, John S. Griffin and David L. Matthews, upon their own behalf and upon behalf of all qualified voters in the respective counties in which plaintiffs live and in the state, who are similarly situated, as is permitted by Rule 23(a) of the Federal Rules of Civil Procedure. The action is brought against certain named and unnamed defendants as members of the same class, all of whom are officials of the State of Indiana or of counties in the State of Indiana, and all of whom are sued in their official capacity.

Jurisdiction in the first case, the Stout case, is predicated upon 42 U.S.C. §§ 1983 and 1988, the Civil Rights Acts, and upon 28 U.S.C. §§ 1343 and 1392(a), which relate to jurisdiction and venue of district courts. The complaint, as amended and supplemented, seeks pursuant to 28 U.S. C. § 2201, a declaration of plaintiffs' rights and of the validity or invalidity of the statutes of the State of Indiana (Ind. Ann.Stats. §§ 34–102 and 34–104 (1949), hereinafter referred to as the "1921 apportionment statutes") which apportion the members of the Indiana General Assembly among the counties of the State, and further, injunctive relief as may be proper to prevent defendants from continuing to comply with the allegedly unconstitutional statutes.

The complaint in the Grills case is an action by plaintiff Nelson G. Grills against the members of the State Election Board, who are also defendants in the Stout case, and is also a declaratory judgment action brought pursuant to 28 U.S.C. § 2201. The action is said to arise under, and jurisdiction is apparently predicated on, Article 4, Section 4, and Article 6 of, and the Fourteenth Amendment to, the Constitution of the United States.

Although the theories of the two actions are not completely alike,[1] the bas-

---

1. The theory of the first action is, briefly, that by reason of shifts in population and passage of time, the present apportionment of the General Assembly results in underrepresentation of persons living in certain counties in violation of the State and Federal Constitutions. The theory of the second action is, briefly, that by

reason of a state court judgment declaring the present apportionment statutes unconstitutional and denying de facto authority of the General Assembly, the conduct of an election from the districts created by the 1921 apportionment statutes violates the Federal Constitution and certain Acts of Congress and the Articles

ic issue presented by each action is whether election of members of the Indiana General Assembly from districts created by the present statutes apportioning the legislature, passed in 1921,[2] is in violation of the State and Federal Constitutions. The first action, the Stout case, is now before the Court following a trial upon the merits and upon a motion to dismiss the action, and the second action, the Grills case, is before the Court upon the motion of the plaintiff for a summary judgment and upon an amended motion to dismiss the action, which motion to dismiss is to be treated as a motion for summary judgment under the provisions of Rule 56 of the Federal Rules of Civil Procedure, since it contains matters outside the pleadings.

■■ There is no dispute about the relevant facts. They have been stipulated into the record and, in part, judicially noticed. The Court's detailed statement of these facts is being filed contemporaneously herewith. It is deemed unnecessary to detail them in this opinion in view of the agreement by the defendants that these facts show that the 1921 apportionment statutes lack a rational basis. This agreement of the defendants sufficiently answers the vital question in these consolidated cases, i. e., "Do the 1921 apportionment statutes establish classifications predicated upon a rational basis or are they utterly arbitrary and lacking in rationality?"[3] This agreement of the defendants also brings into play the decision of the United States Supreme Court in Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), under which the instant court is to take jurisdiction and dispose of the plaintiffs' suits. In respect to the latter, the Court finds and concludes, in fact and in law, that it has jurisdiction of the parties and the subject matter in each action.

■ In view of defendants' agreement that there is no rational basis for the 1921 apportionment acts, the conclusion follows, Baker v. Carr, that the acts are unconstitutional since they deny equal protection to plaintiffs, and those represented by them, in violation of the Fourteenth Amendment to the Constitution of the United States.

Plaintiffs therefore are entitled to injunctive relief.

The Stout case was filed in August, 1961, and this three-judge court was appointed by Chief Judge Hastings on August 14, 1961. The Grills case was filed in August, 1962. On October 19, 1962, the Court declined, at Grills' insistence, to interfere with the November, 1962, election of members of the General Assembly. The Court at that time deemed it wise to abstain from action until after the General Session of the legislature in January and February of 1963. In that session, a reapportionment bill was passed by both houses of the General Assembly. It was vetoed by the Governor. The veto was sustained by the General Assembly. A Special Session was called by the Governor for April, 1963, and the call of the session included the subject of reapportionment. This Court again abstained from action with the expectation that appropriate reapportionment legislation would be adopted into law. Postponement of court action on both occasions was consistent with the wholesome doctrine of judicial abstention. To have done otherwise on either occasion would have been an unseemly judicial interference with a legislative function and responsibility.

The legislature in the Special Session adopted a resolution providing for a new basis of apportionment of legislative districts. The resolution, if it were to survive all necessary steps resulting in

---

of Compact of the Ordinance of 1787. The complaint in the second action also certains allegations similar to those in the first action.

2. Ind.Ann.Stats. §§ 34–102, 34–104 (1949).

3. This we believe embraces the traditional test to be applied in deciding whether the equal protection clause of the Fourteenth Amendment has been violated. Baker v. Carr, 206 F.Supp. 341, at 345 (M.D.Tenn.1962).

amendment of the Constitution, would not result in a legislature from reapportioned districts until the 1975 General Session.

■ In June, 1963, defendants conceded for the first time in this litigation that the Indiana apportionment statute of 1921 was, in effect, unconstitutional. The Court's duty thereupon became clear.

This Court cannot perform that duty by accepting the legislative resolution of April, 1963, as a satisfactory effort to establish a just and constitutional reapportionment of Indiana's present legislative districts having no rational basis. To accept the resolution as satisfactory would unduly delay justice for the citizens of Indiana.

■ This Court is urged by plaintiffs to direct an "at-large" election for members of the General Assembly. The Court is not disposed to burden the Indiana electors with the obvious confusing and disrupting consequences of ordering that relief, especially in 1964, the year of a presidential election. This "cure" could be worse than the "disease." Nor has the Court seriously considered declaring void the November, 1962, election of members of the General Assembly of Indiana upon the vain hope that "within thirty days" the members thereby rendered de facto would adopt a just and constitutional reapportionment statute. To grant this prayer would be reckless.

Finally, plaintiffs ask this Court itself to establish a just reapportionment. This relief the Court must grant in the absence of just and constitutional reapportionment legislation by the Indiana General Assembly.

It is unfortunate that federal courts in general have of necessity been drawn into assuming legislative responsibility because of the failure of representatives elected by the people to abide by their sworn duty under the constitutions of the states. This Court is concerned to afford to the citizens of Indiana every practical, possible opportunity to obtain a just and constitutional apportionment

through the legislative processes established by them in their fundamental law.

We have decided, therefore, that we should suspend the effective date of the injunctive relief to be granted by this Court simultaneously with the filing of this opinion; and that we should defer court action to establish the appropriate reapportionment of legislative districts of the state. This is the middle path between accepting the legislative resolution of April, 1963, and granting the "at-large" election or the "thirty-day" relief.

We think the electors of Indiana should have an opportunity in 1964—with the aid of all other persons and groups interested in the problem—to select representatives for the General Assembly who may hold best promise of dedication to attaining the goal of a just and constitutional apportionment in the 1965 General Assembly. We cannot assume that, of necessity, the electors cannot successfully demand and receive from the political parties of their choice an opportunity to make such a selection.

It is our opinion, therefore, that the injunctive relief to be granted here should be made effective after the November, 1964, election, and that any court-established reapportionment of the State of Indiana should be dependent upon the failure of the General Assembly elected by the people in 1964 to enact appropriate reapportionment legislation in the 1965 General Session.

## DECLARATORY JUDGMENT AND DECREE.

In accordance with the foregoing opinion, and based upon the Court's detailed findings of fact being filed contemporaneously herewith, and it having been agreed by the defendants that the 1921 apportionment statutes (Ind.Ann.Stats. §§ 34–102, 34–104 (1949)) have no rational basis, and the Court having considered the pending motions and being further fully advised in the premises,

It is ordered that defendants' motion to dismiss the complaint in Grills v.

Welsh, et al., No. IP 62–C–326, be and it is hereby denied.

It is further ordered that the motion of plaintiff Grills in Case No. IP 62–C–326 for summary judgment be and it is hereby denied in so far as it differs from the relief prayed for in Case No. IP 61–C–236.

The Court finds, on the facts stipulated, and upon the admission of defendants by the Attorney General of the State of Indiana, that there is no rational basis for the said 1921 apportionment statutes, and finds that the said statutes are invidiously discriminatory in violation of the Fourteenth Amendment of the Constitution of the United States; and it is therefore declared by the Court that said statutes are unconstitutional and void.

The Court further finds, by reason of the foregoing declaration, that the plaintiffs are entitled to injunctive relief prayed for in Case No. IP 61–C–236;

It is therefore ordered, adjudged and decreed, that the named defendants in each of the consolidated actions, and the unnamed defendants in the Stout action, as members of the same class as those named in said action, all of whom are officials of the State of Indiana or of counties in the State of Indiana, and their successors in office, be and they are hereby restrained and enjoined from conducting under said 1921 apportionment statutes any election after the 1964 general election to be held in November, 1964.

It is therefore ordered that the Court reserves judgment at this time upon all other relief prayed by plaintiffs; that these consolidated cases are hereby reopened for the purpose of receiving additional recommendations from the parties hereto with respect to the further relief to be granted herein; and the Court hereby reserves jurisdiction in these consolidated causes to grant such further relief as may from time to time be deemed appropriate.

## STATEMENT OF THE FACTS.

Based upon the evidence before the Court in the Stout case, which has been submitted largely by stipulation, and other facts of judicial notice, along with the pleadings, admissions, and affidavit in the Grills case, the Court finds the facts as here set out.

The plaintiffs in the first action, Bruce L. Stout, John E. Hunter, John S. Griffin, and David L. Matthews, are citizens, residents and qualified voters residing in four counties of the State of Indiana, to wit, Allen, Lake, Marion, and St. Joseph counties, respectively. The defendant Charles O. Hendricks is the Secretary of State of the State of Indiana; the duties of his office include receipt of declarations of candidacy for nomination of members of the Indiana General Assembly at primary elections, transmission to the Clerk of the Circuit Court in each county of a certified list of candidates entitled to be voted for at primary elections, and other administrative duties in connection with the holding of primary elections at which candidates for the Indiana General Assembly are nominated. The defendants Matthew E. Welsh, Edwin M. S. Steers and James E. Noland, named in both actions, are the members of the State Election Board of Indiana. The State Election Board has the duty of administering the election laws of the State of Indiana in their statewide application, distributing ballots and other supplies to local election officials, and generally supervising the conduct of elections on a statewide basis and by local election officials.

The other named defendants [1] are the Clerks of the Circuit Court and members

1. Elton L. Marquart, Clerk of the Allen County Circuit Court and member of the Allen County Election Board; John E. Williams, Sr., Chairman of the Allen County Election Board; Ramon S. Perry, member of the Allen County Election Board; Francis T. Grandys, Clerk of the Lake County Circuit Court and member of the Lake County Election Board; Walter C. Zurbriggen, Chairman of the Lake County Election Board; William Messex, member of the Lake County Election Board; Edwin McClure, Clerk of the Marion County Circuit Court and mem-

of the County Election Boards of Allen, Lake, Marion and St. Joseph Counties, Indiana. The official duties of the Clerk of Circuit Court in each county of Indiana include acting as *ex officio* member and secretary of the County Election Board, publication of the list of candidates for office, including members of the Indiana General Assembly, to be voted upon at primary elections in such county, furnishing to the Secretary of State certified statements of the number of votes cast in such county for each candidate for member of the Indiana General Assembly, furnishing certificates of election to those persons elected to office in such county, including members of the Indiana General Assembly, preservation of ballots and election records, and other ministerial duties in connection with the holding of primary and general elections in such county. The County Election Board in each county has the duty of conducting all primary and general elections in such county (other than town elections), including preparation and distribution of ballots and voting machines, appointment and supervision of precinct election officials, tabulating the vote of the county for each office and certifying to the Clerk of Circuit Court the number of votes cast for each candidate for office (including members of the Indiana General Assembly) in each precinct, ward or township of the county. The class defendants, not specifically named as parties to this action, include the Clerks of Circuit Courts and members of the County Election Boards in each of the ninety-two counties into which the State of Indiana is divided.

The General Assembly of Indiana, as established by Article 4, Section 2, of the Constitution of Indiana, consists of a House of Representatives of one hundred (100) members and a Senate of fifty (50) members. Under the Indiana Constitution regular sessions of each General Assembly are held biennially in odd-numbered years (Article 4, Section 9) and are limited in duration to sixty-one days (Article 4, Section 29). Special sessions can meet only upon call of the Governor (Article 4, Section 9) and each special session is limited in duration to forty (40) days (Article 4, Section 29). There is no state constitutional limitation upon the number of special sessions of any General Assembly which the Governor may call.

Unlike many state constitutions, the Indiana Constitution contains no provision for initiative or referendum under which the people themselves could initiate and pass legislation for the purpose of reapportioning the Indiana General Assembly. And, under the Indiana Constitution, there is no effective way by which a constitutional convention may be called for the purpose of amending the Indiana Constitution, unless the General Assembly should provide for placing upon the ballot in any general election the question of whether or not such a constitutional convention shall be called.

The provisions of the Indiana Constitution relating to division and apportionment of the membership of the General Assembly among the counties and districts of the State are as follows:

[Article 4, Sections 2, 3, 4, 5, 6, and 7.]

"§ 2. *Number of members.*—The Senate shall not exceed fifty, nor the House of Representatives one hundred members; and they shall be chosen by the electors of the respective counties or districts, into which the State may, from time to time, be divided.

"§ 3. *Term of office.*—Senators shall be elected for the term of four years, and Representatives for the term of two years, from the day next after their general election: Provided, however, that the Senators

---

ber of the Marion County Election Board; Robert S. Smith, Chairman of the Marion County Election Board; Mark W. Gray, member of the Marion County Election Board; Aloysious J. Kromkowski, Clerk of the St. Joseph County Circuit Court and member of the St. Joseph County Election Board; John E. Doran, Chairman of the St. Joseph County Election Board; and Victor A. Melchiorre, member of the St. Joseph County Election Board.

elect, at the second meeting of the General Assembly under this Constitution, shall be divided, by lot, into two equal classes, as nearly as may be; and the seats of Senators of the first class shall be vacated at the expiration of two years, and those of the second class, at the expiration of four years; so that one-half, as nearly as possible, shall be chosen biennially forever thereafter. And in case of increase in the number of Senators, they shall be so annexed, by lot, to one or the other of the two classes, as to keep them as nearly equal as practicable.

"§ 4. *Periodical enumeration.*—The General Assembly shall, at its second session after the adoption of this Constitution, and every sixth year thereafter, cause an enumeration to be made of all the male inhabitants over the age of twenty-one years. * * *

"§ 5. *Apportionment of representation.*—The number of Senators and Representatives shall, at the session next following each period of making such enumeration, be fixed by law, and apportioned among the several counties, according to the number of male inhabitants, above twenty-one years of age, in each: Provided, that the first and second elections of members of the General Assembly, under this Constitution, shall be according to the apportionment last made by the General Assembly, before the adoption of this constitution. * * *

"§ 6. *Districts—Requirements as to divisions.*—A Senatorial or Representative District, where more than one county shall constitute a district, shall be composed of contiguous counties; and no county, for Senatorial apportionment, shall ever be divided.

"§ 7. *Qualifications of members of assembly.*—No person shall be a Senator or a Representative who, at the time of his election, is not a citizen of the United States; nor any one who has not been for two years next preceding his election, an inhabitant of this State, and, for one year next preceding his election, an inhabitant of the county or district, whence he may be chosen. Senators shall be at least twenty-five, and Representatives at least twenty-one years of age."

In 1921, the General Assembly enacted Ind.Ann.Stats., Sections 34–102 and 34–104 (1949), (Indiana Acts 1921, Chapter 78, Section 2, and Acts 1921, Chapter 271, Section 2) (hereinafter referred to as the "1921 apportionment statutes"), which apportioned the members of the Indiana House of Representatives and Senate among the ninety-two counties of the state, as required by the aforementioned provisions of the Indiana Constitution. Such apportionment presumably was based upon an official enumeration of male inhabitants over twenty-one years of age in each county taken in 1919 and published by the Auditor of State. This apportionment has been in effect for all elections of members of the General Assembly beginning with the 1922 elections and is now in effect. No complete state enumeration, as required by Article 4, Section 4, of the Indiana Constitution, for purposes of apportionment of the Indiana General Assembly, has been taken or certified since 1931. The statutes (Ind.Ann.Stats. §§ 65–601 to 65–625 [Burns' 1951 Repl.]) which provided for a *method* of taking the enumeration required under Article 4, Section 4, of the Indiana Constitution were repealed by Indiana Acts 1961, Chapter 319, and no law presently in effect provides for a method of taking such enumeration.

The districts established by the 1921 apportionment statutes; the number of representatives or senators allocated to each district; the population per representative and senator of each district as shown by the 1919 state enumeration of male inhabitants over twenty-one years of age in each county; the population per representative and senator of the same districts as shown by the 1960 federal census of voting population in each coun-

ty; and the relationship of the population per representative and senator in each district to the population of a district apportioned upon population, or an "ideal" district (with respect to both the 1919 state enumeration and 1960 federal census of voting population) are listed in Appendix A (with respect to the House of Representatives) and Appendix B (with respect to the Senate). [For purposes of these tables, in instances where one county is allocated one or more representative or senator, and in addition such county is allocated another representative or senator jointly with an adjoining county, such overlapping districts are combined in order to determine population per representative or senator. The population of an "ideal" district is defined to mean the total population of the state (as determined by the enumeration or census referred to, as the case may be) divided by 100, in the case of the House of Representatives (Appendix A), or such population divided by 50, in the case of the Senate (Appendix B).]

Between 1920 and 1960 the total population of the State of Indiana, as determined by the decennial U. S. Census for 1920 and 1960, respectively, increased from 2,930,390 to 4,662,498, representing an increase in population for the state as a whole of 59.1 per cent. However, population changes in the various counties of Indiana during such period have been very uneven, with seventy-two counties having increased in population during such period and the remaining twenty counties having decreased in population. Eleven counties, including the four large counties in which plaintiffs in this action reside, more than doubled in population between 1920 and 1960. Of the counties which decreased in population during such period, thirteeen counties had a decrease of 10 per cent or more, and seven counties had decreases of more than 20 per cent. In terms of voting population per representative and senator as determined by the 1960 federal census, the largest representative district listed in Appendix A (Lake and Porter Counties combined) is 5.8 times as large as the smallest representative district (Parke County), and the largest senatorial district listed in Appendix B (Lake County) is 3.9 times as large as the smallest senatorial district (Clay and Parke Counties combined). Thus, one vote in Parke County for a member of the Indiana House of Representatives has the same weight as 5.8 votes in Lake or Porter County for a member of the House of Representatives, and one vote in Parke or Clay County for a member of the Indiana Senate has the same weight as 3.9 votes in Lake County for a member of the Senate.

The evidence shows that, based upon the 1960 federal census of voting population in the various counties of Indiana, including districts now vacant by reason of death or resignation,[2] twenty of the one hundred members of the Indiana House of Representatives represent districts having less than two-thirds of the population of an "ideal" district, and fourteen additional members represent districts having between two-thirds and three-fourths of the population of an "ideal" district. Twenty-six members of the House of Representatives represent districts having more than 125 per cent of the population of an "ideal" district. In the case of the Indiana Senate, eleven of the fifty members of that body represent districts having less than two-thirds of the population of an "ideal" district, and five additional senators represent districts having between two-thirds and three-fourths of the population of an "ideal" district, and thirteen senators represent districts having more than 125 per cent of the population of an "ideal" district. The evidence further establishes that, based upon the 1960 federal census of voting population in the various Indiana counties, eighteen House of Representatives districts electing twenty members of the House have voting populations per representative less than half

2. By judicial notice we find that there are presently two vacancies in the Senate and one vacancy in the House of Representatives.

as large as that of the district including Allen County; nineteen districts electing twenty-one members of the House have voting populations per representative less than half as large as that of the district including Marion County; forty-two districts electing forty-seven members of the House have voting populations per representative less than half as large as that of St. Joseph County; and forty-eight districts electing fifty-six members of the House having voting populations per representative less than half as large as that of the district including Lake County. Eleven Senate districts each electing one member to the Indiana Senate have voting populations per senator less than half as large as that of the districts including Allen County and Marion County; thirteen districts each electing one senator have voting populations per senator less than half as large as that of the district including St. Joseph County; and twenty-one districts electing twenty-two senators have voting populations per senator less than half as large as that of Lake County. Finally, the evidence shows that, according to the 1960 federal census, 35.3 per cent of the voting population of Indiana elects 51 per cent of the one-hundred members of the Indiana House of Representatives, and 37.4 per cent of the voting population elects twenty-six of the fifty members of the Indiana Senate.

The "adjusted representation" of each county in Indiana in the House of Representatives and the Senate, and the "adjusted total representation" of each county in the General Assembly, as computed in accordance with the 1960 federal census of voting population, is listed in Appendix C. "Adjusted representation" for each county is computed as follows: The number of representatives or senators apportioned to such county alone, plus a fraction for each representative or sena-

tor which such county shares with one or more other counties, the numerator of which fraction is the voting population of such county and the denominator of which is the total voting population of all counties in the representative or senatorial district. "Adjusted total representation" for each county is computed as follows: (1) The number of representatives apportioned to such county alone, plus (2) twice the number of senators apportioned to such county alone,[3] plus (3) a fraction for each representative which such county shares with one or more other counties, the numerator of which is the voting population of such county and the denominator of which is the total voting population of all counties in the representative district, plus (4) double[4] a fraction for each senator which such county shares with one or more other counties, the numerator of which fraction is the voting population of such county and the denominator of which is the total voting population of all counties in the senatorial district.[5] For purposes of this table (Appendix C), the various counties of Indiana are grouped into three categories, as follows:

(1) "Rural" Counties are those counties having no municipality with total population of 10,000 or more; (2) "Semi-rural" Counties are those counties having one or more municipalities with total population of more than 10,000 but no municipality having total population of more than 50,000; and (3) "Urban" Counties are those counties having one or more municipalities with total population in excess of 50,000. As is shown by Appendix C, the disparity in representation in the General Assembly is not confined to differences based upon the rural, semirural or urban nature of the various counties. For example, Posey County, a rural county, has an Adjusted Total Representation of 0.27 with a 1960

3. To reflect the fact that there are 50 senators whereas there are 100 representatives.

4. Again, to reflect the fact that there are only one-half as many senators as representatives.

5. See Appendix to Opinion of Mr. Justice Harlan in Baker v. Carr, 369 U.S. 186, 342–344, 82 S.Ct. 691, 777–778, 7 L.Ed.2d 663 (1962).

voting population of 11,666, while Parke County, also a rural county, has a 1960 voting population of only 9,390, but has an Adjusted Total Representation of 1.74. Johnson County, also a rural county, has a 1960 voting population of 25,059 (almost three times as great as that of Parke County), but has a Total Adjusted Representation of 0.18. Similar disparities are found in counties classed as "semirural." Thus Porter County has a 1960 voting population of 33,694 with an Adjusted Total Representation of 1.26, while another semirural county, Huntington, has an Adjusted Total Representation of 2.26, but has a 1960 voting population of only 20,615. And the urban County of Vigo has 6.66 Adjusted Total Representation with a 1960 voting population of 68,157, whereas the urban County of St. Joseph has an Adjusted Total Representation of only 6.76, but had a 1960 voting population of 141,959.

The above are merely a few of the instances in which the evidence shows that the representative and senatorial districts in the Indiana General Assembly are not presently apportioned among the several counties of the State according to the number of male inhabitants over twenty-one years of age in each, as required by Article 4, Section 5, of the Indiana Constitution, and that such districts are not apportioned according to voting population, total population or any other criterion relative to population, in either the House of Representatives or the Senate. Nor are such districts apportioned upon a basis of the urban, semirural or rural character thereof. In an apportionment of districts based upon population, whether the criterion used is male inhabitants over twenty-one years of age, voting population, or total population, and utilizing the 1960 federal census figures, with the number of representatives or senators to which a county would be entitled rounded to the nearest half number, the counties in which plaintiffs in this action reside would be entitled to the following number of representatives and senators: Allen County—5 representatives and 2½ senators; Lake County—11 representatives and 5½ senators; Marion County—15 representatives and 7½ senators; St. Joseph County—5 representatives and 2½ senators. The number of representatives and senators which these counties now have (joint floterial representatives and senators being counted for this purpose as apportioned one-half to such county) in accordance with the 1921 apportionment statutes, are as follows: Allen County—3½ representatives and 1½ senators; Lake County—5½ representatives and 3 senators; Marion County—11½ representatives and 5½ senators; St. Joseph County—3 representatives and 1½ senators.

The defendants in this action have not attempted to make, and the Court has been unable to find, any rational explanation or justification for the apportionment of the membership in either house of the Indiana General Assembly, as it presently exists under the 1921 apportionment statutes, in terms of population, geography, area, economic interests, historical tradition, representation of political units, weighted representation for rural as opposed to urban areas, or any other criterion which might conceivably be thought relevant to provide a rational basis for the districts as they presently exist. The Attorney General of Indiana, representing the various state officials who are party defendants, has candidly stated that the only explanation which he can make for the present apportionment, resulting from failure of nineteen consecutive general assemblies to perform their duty to reapportion under the Indiana Constitution is "the desire of the individual legislators to retain their seats."

The 93d Indiana General Assembly was elected, from districts created by the 1921 apportionment statutes, at the general election held November 6, 1962; it convened in regular session January 10, 1963, and adjourned sine die March 11, 1963. During the regular session of the 93d General Assembly, six resolutions were introduced proposing amendments to the Indiana Constitution relative to apportionment of the General Assembly.

Only one of these, House Joint Resolution 6, was reported from committee. That resolution passed the House but was substantially amended in the Senate, the House dissented from the Senate amendments, and it failed to pass during such regular session. During the regular session of the 93d General Assembly, Senate Bill 160 passed the Senate by a vote of 40 to 8 and was amended and passed the House by a vote of 52 to 46, the Senate concurring in the House amendments. This bill, a copy of which is attached hereto as Appendix D, would have utilized the 1960 federal census as an enumeration of all inhabitants over twenty-one years of age of the various counties of Indiana and would have established new representative and senatorial districts effective for all candidates for the Indiana House of Representatives and Senate in the 1964 general election and thereafter, repealing the 1921 apportionment statutes. However, that bill, which became Senate Enrolled Act 160, was vetoed by the Governor of Indiana, Matthew E. Welsh, on March 15, 1963. In the special session of the 93d General Assembly the Senate sustained such veto on April 1, 1963, by a vote of 23 in favor of overriding the veto and 24 in favor of sustaining it, and such act thereupon failed to become law or to provide for a new apportionment of legislative districts for the 1964 election. [In his veto message with respect to this act, the Governor stated, "The redistricting of both the House of Representatives and the Senate which would be accomplished by this Act is in gross violation of Article 4, Section 5 of the Indiana Constitution, requiring apportionment of Senators and Representatives on a population basis," and gave a number of specific examples of what he considered to be inequities among various counties given the same representation under such act.]

Pursuant to the authority vested in him by Article 4, Section 9, the Governor of Indiana, Matthew E. Welsh, called a special session of the 93d General Assembly, which convened March 12, 1963, and adjourned sine die April 20, 1963. During the special session of the 93d General Assembly, three additional resolutions were introduced proposing amendments to the Indiana Constitution relative to apportionment of the Indiana General Assembly but none of these was reported from committee. House Joint Resolution 6, Laws 1963, Sp.Sess., c. 47, which had been introduced during the regular session, as amended passed both houses of the General Assembly on the last day of such special session, April 20, 1963. Such joint resolution, a copy of which is attached hereto as Appendix E, if adopted as an amendment to the Indiana Constitution, would establish a new basis for apportionment and would require the General Assembly to pass legislation implementing such amendment at its first regular session following the year in which the 1970 federal decennial census is promulgated. Such amendment, if adopted, could not be implemented by new apportionment acts until the 1973 regular session, and new districts established pursuant to such amendment could not be utilized as the districts for election of members of the General Assembly until the 1974 general election. In accordance with the procedure set out in Article 16 of the Indiana Constitution for adoption of constitutional amendments, the aforesaid House Enrolled Joint Resolution 6 was referred to the next General Assembly, the 94th General Assembly, for reconsideration. Under Article 16 of the Indiana Constitution, such resolution, or any other proposed constitutional amendment, could become a part of the Indiana Constitution only if passed by a majority of all members elected to each house of two consecutive general assemblies and if so approved, subsequently ratified by a majority of voters voting upon such proposed amendment at any election.

During the special session of the 93d General Assembly, three additional bills were considered which, if passed, would have reapportioned either the House of Representatives or Senate, or both, effective for the 1964 general election and thereafter. All such bills failed to pass.

Senate Bill 420, which as reported by a conference committee would have reapportioned both houses of the General Assembly, was defeated by the House of Representatives by a vote of 57 to 32, and three successive sets of new conferees who were appointed failed to agree upon a second conference report. House Bill 1553, which would have reapportioned the House of Representatives only, passed second reading in the House but was not called up for final passage. House Bill 1369, which originally dealt with a different subject, was reported to the Senate as an amended bill to reapportion the senatorial districts and in such form was passed by the Senate by a vote of 39 to 8, but no further action on such bill was taken by the House of Representatives.

The Governor of Indiana has not called a second special session of the 93d General Assembly. Unless the Governor of Indiana should call another special session of the 93d General Assembly, no further meeting of that General Assembly will be held. The next meeting of the Indiana General Assembly, absent such a special session, would normally be the regular session of the 94th General Assembly, which would be elected in November 1964, and would convene in January 1965. Thus, the 93rd General Assembly to date has been either unable or unwilling to reapportion the legislative districts among the various counties of the state, and unless further action is taken, the districts established by the 1921 apportionment statutes will remain in effect with respect to election of the 94th General Assembly in 1964, and for future elections to the Indiana General Assembly.

Before concluding the statement of the facts, we direct our attention specifically to the Grills case. On July 29, 1959, Nelson G. Grills, as State Senator, brought an action for a declaratory judgment against certain other state senators in the Marion Superior Court, Room No. 5, Marion County, Indiana, wherein the capital of the State is located, the cause of action being S 59–600. The Attorney General of the State of Indiana was served as required by law and entered his appearance. On March 17, 1961, the Judge of that Court rendered a declaratory judgment declaring:

"1. Chapters 78 and 271 of the Acts of 1921 are unconstitutional by reason of the apportionment under their terms failing to comply with the requirements of Article 4, Section 5 of the Indiana Constitution.

"2. Any General Assembly, after the date of this Declaratory Judgment apportioned under the terms of Chapter 78 and Chapter 271 of the Acts of 1921 is declared to be in violation of the act of Congress enabling inhabitants of the territory of Indiana to form a state, approved April 19, 1816, Article 4, Sections 1 and 4 and Article 6, Sections 1 and 2 of the United States Constitution.

"3. Members of a General Assembly attempting to serve after the date of this judgment, are without defacto authority to act as members of the General Assembly, apportioned under the terms of Chapter 78 and Chapter 271 of the Acts of 1921. It therefore follows, that Plaintiff and Defendants are in the same category as all the members of the General Assembly. Costs assessed against the Plaintiff."

No appeal from said judgment was perfected.

## APPENDIX A

(To Statement of Facts)

### INDIANA HOUSE OF REPRESENTATIVES

Present Districts Ranked According to 1960 Voting Population Per Representative, Showing Changes in Population Relative to Ideal District, 1919-1960.

Note: In the case of counties which are assigned representatives individually and an additional representative jointly with another county, the two counties have been combined for purposes of this table.

| District | No. of Reps. | 1919 State Enumeration (Males Over 21) | | 1960 Federal Census Voting Population | |
|---|---|---|---|---|---|
| | | Population Per Rep. | % Ideal District | Population Per Rep. | % Ideal District |
| IDEAL | | 8,084 | | 27,779 | |
| Parke | 1 | 5,307 | 65.6 | 9,390 | 33.8 |
| Vermillion | 1 | 6,894 | 85.3 | 11,487 | 41.4 |
| Fountain | 1 | 5,641 | 69.8 | 11,580 | 41.7 |
| Jay | 1 | 6,674 | 82.6 | 13,960 | 50.2 |
| Sullivan | 1 | 8,656 | 107.1 | 14,061 | 50.6 |
| Clay | 1 | 8,297 | 102.6 | 15,679 | 56.4 |
| Daviess | 1 | 6,662 | 82.4 | 15,893 | 57.2 |
| Crawford-Harrison | 1 | 7,883 | 97.5 | 16,503 | 59.4 |
| Boone | 1 | 7,056 | 87.3 | 16,682 | 60.0 |
| Noble | 1 | 6,606 | 81.7 | 16,706 | 60.1 |
| DeKalb | 1 | 7,367 | 91.1 | 16,784 | 60.4 |
| Ripley-Switzerland | 1 | 8,143 | 100.7 | 16,788 | 60.4 |
| Knox-Pike | 2 | 7,979 | 98.7 | 17,106 | 61.6 |
| Greene | 1 | 9,957 | 123.2 | 17,145 | 61.7 |
| Jasper-Newton | 1 | 6,800 | 84.1 | 17,178 | 61.8 |
| Randolph | 1 | 7,614 | 94.2 | 17,536 | 63.1 |
| Fulton-Pulaski | 1 | 8,304 | 102.7 | 17,972 | 64.7 |
| Cass-Carroll | 2 | 8,121 | 100.5 | 18,175 | 65.4 |
| Benton-White | 1 | 8,411 | 104.0 | 18,668 | 67.2 |
| Gibson | 1 | 8,325 | 103.0 | 18,738 | 67.4 |
| Clinton | 1 | 8,003 | 99.0 | 18,965 | 68.3 |
| Marshall | 1 | 6,437 | 79.6 | 19,082 | 68.7 |
| Morgan | 1 | 6,013 | 74.4 | 19,116 | 68.8 |
| Wabash | 1 | 7,773 | 96.2 | 19,287 | 69.4 |
| Dearborn-Ohio | 1 | 7,619 | 94.2 | 19,480 | 70.1 |
| Perry-Spencer | 1 | 9,235 | 114.2 | 19,600 | 70.6 |
| Montgomery | 1 | 8,741 | 108.1 | 19,759 | 71.1 |
| LaGrange-Steuben | 1 | 7,735 | 95.7 | 20,027 | 72.1 |
| Shelby | 1 | 7,501 | 92.8 | 20,401 | 73.4 |
| Huntington | 1 | 8,469 | 104.8 | 20,615 | 74.2 |
| Henry-Rush | 2 | 7,476 | 92.5 | 20,776 | 74.8 |
| Washington-Orange | 1 | 9,820 | 121.5 | 21,087 | 75.9 |
| Martin-Dubois | 1 | 7,995 | 98.9 | 21,324 | 76.8 |

| District | No. of Reps. | 1919 State Enumeration (Males Over 21) | | 1960 Federal Census Voting Population | |
|---|---|---|---|---|---|
| | | Population Per Rep. | % Ideal District | Population Per Rep. | % Ideal District |
| IDEAL | | 8,084 | | 27,779 | |
| Decatur-Jennings | 1 | 9,412 | 116.4 | 21,900 | 78.8 |
| Putnam-Owen | 1 | 9,642 | 119.3 | 21,928 | 78.9 |
| Lawrence | 1 | 7,355 | 91.0 | 22,232 | 80.0 |
| Jackson-Brown | 1 | 8,135 | 100.6 | 22,285 | 80.2 |
| Miami | 1 | 8,306 | 102.7 | 22,524 | 81.1 |
| Vigo | 3 | 9,375 | 116.0 | 22,719 | 81.8 |
| Jefferson-Scott | 1 | 7,458 | 92.3 | 22,989 | 82.8 |
| Hendricks | 1 | 5,719 | 70.7 | 23,304 | 83.9 |
| Hamilton | 1 | 5,853 | 72.4 | 23,547 | 84.8 |
| Fayette-Franklin | 1 | 9,123 | 112.9 | 23,875 | 85.9 |
| Wayne-Union | 2 | 7,617 | 94.2 | 24,662 | 88.8 |
| Kosciusko | 1 | 7,074 | 87.5 | 24,195 | 87.1 |
| Howard-Tipton | 2 | 8,263 | 102.2 | 24,997 | 90.0 |
| Adams-Wells | 1 | 10,873 | 134.5 | 26,764 | 96.3 |
| Grant-Blackford | 2 | 9,087 | 112.4 | 26,929 | 96.9 |
| Bartholomew | 1 | 6,772 | 83.8 | 27,850 | 100.2 |
| Tippecanoe-Warren | 2 | 7,458 | 92.3 | 28,256 | 101.7 |
| Floyd | 1 | 8,511 | 105.3 | 30,503 | 109.8 |
| Madison-Hancock | 3 | 8,450 | 104.5 | 30,514 | 109.8 |
| Elkhart | 2 | 7,949 | 98.3 | 31,325 | 112.8 |
| Vanderburgh-Warrick-Posey | 4 | 8,617 | 106.6 | 31,848 | 114.6 |
| Delaware | 2 | 8,122 | 100.5 | 32,465 | 116.9 |
| Monroe | 1 | 6,217 | 76.9 | 34,316 | 123.5 |
| LaPorte-Stark | 2 | 8,303 | 102.7 | 34,328 | 123.6 |
| Clark | 1 | 7,864 | 97.3 | 35,657 | 128.4 |
| Allen-Whitley | 4 | 8,180 | 101.2 | 37,331 | 134.4 |
| Marion-Johnson | 12 | 8,354 | 103.3 | 37,429 | 134.7 |
| St. Joseph | 3 | 8,711 | 107.8 | 47,320 | 170.3 |
| Lake-Porter | 6 | 8,726 | 107.9 | 54,502 | 196.2 |

APPENDIX B

(To Statement of Facts)

INDIANA SENATE

Present Districts Ranked According to 1960 Voting Population Per Senator, Showing Changes in Population Relative to Ideal District, 1919–1960.

Note: In the case of counties which are assigned senators individually and an additional senator jointly with another county, the two counties have been combined for purposes of this table.

| District | No. of Sen. | 1919 State Enumeration (Males Over 21) | | 1960 Federal Census Voting Population | |
| | | Population Per Sen. | % Ideal District | Population Per Sen. | % Ideal District |
|---|---|---|---|---|---|
| IDEAL | | 16,168 | | 55,558 | |
| Clay-Parke | 1 | 13,604 | 84.1 | 25,069 | 45.1 |
| Gibson-Pike | 1 | 13,375 | 82.7 | 27,061 | 48.7 |
| Warren-Fountain-Vermillion | 1 | 15,526 | 96.0 | 28,135 | 50.6 |
| Jay-Randolph | 1 | 14,288 | 88.4 | 31,496 | 56.7 |
| Whitley-Huntington | 1 | 13,284 | 82.2 | 32,970 | 59.3 |
| Montgomery-Putnam | 1 | 14,735 | 91.1 | 34,446 | 62.0 |
| Dubois-Perry-Spencer | 1 | 14,386 | 89.0 | 35,021 | 63.0 |
| Adams-Wells-Blackford | 1 | 14,630 | 90.5 | 35,697 | 64.2 |
| Cass-Fulton | 1 | 16,177 | 100.1 | 36,599 | 65.9 |
| DeKalb-Steuben-LaGrange | 1 | 15,102 | 93.4 | 36,811 | 66.2 |
| Scott-Jackson-Washington | 1 | 12,943 | 80.1 | 37,034 | 66.6 |
| Lawrence-Martin-Orange | 1 | 15,433 | 95.4 | 38,644 | 69.6 |
| Ripley-Dearborn-Jennings | 1 | 15,773 | 97.6 | 39,243 | 70.6 |
| White-Carroll-Clinton | 1 | 17,779 | 110.0 | 41,081 | 73.9 |
| Vigo-Sullivan | 2 | 18,392 | 113.8 | 41,109 | 74.0 |
| Knox-Daviess | 1 | 17,569 | 108.7 | 41,782 | 75.2 |
| Kosciusko-Wabash | 1 | 14,847 | 91.8 | 43,482 | 78.3 |
| Grant | 1 | 14,417 | 89.2 | 44,924 | 80.8 |
| Wayne | 1 | 13,334 | 82.5 | 45,523 | 81.9 |
| Shelby-Rush-Fayette | 1 | 17,629 | 109.0 | 46,972 | 84.5 |
| Harrison-Floyd-Crawford | 1 | 16,394 | 101.4 | 47,006 | 84.6 |
| Hendricks-Morgan-Owen | 1 | 15,380 | 95.1 | 49,661 | 89.4 |

| District | No. of Sen. | 1919 State Enumeration (Males Over 21) | | 1960 Federal Census Voting Population | |
|---|---|---|---|---|---|
| | | Population Per Sen. | % Ideal District | Population Per Sen. | % Ideal District |
| IDEAL | | 16,168 | | 55,558 | |
| Tipton-Hamilton-Boone | 1 | 17,402 | 107.6 | 49,699 | 89.4 |
| Union-Franklin-Decatur-Bartholomew | 1 | 18,537 | 114.7 | 52,966 | 95.3 |
| Brown-Monroe-Greene | 1 | 17,870 | 110.5 | 55,455 | 99.8 |
| Ohio-Switzerland-Jefferson-Clark | 1 | 17,304 | 107.0 | 57,466 | 103.4 |
| Benton-Tippecanoe | 1 | 15,516 | 96.0 | 58,268 | 104.9 |
| Porter-Jasper-Newton-Pulaski | 1 | 15,953 | 98.7 | 58,322 | 105.0 |
| Madison-Henry-Hancock | 2 | 17,466 | 108.0 | 60,511 | 108.9 |
| Elkhart | 1 | 15,897 | 98.3 | 62,650 | 112.8 |
| Miami-Howard | 1 | 20,338 | 125.8 | 63,048 | 113.5 |
| Vanderburgh-Posey-Warrick | 2 | 17,234 | 106.6 | 63,696 | 114.6 |
| Delaware | 1 | 16,243 | 100.5 | 64,929 | 116.9 |
| LaPorte-Starke | 1 | 16,605 | 102.7 | 68,655 | 123.6 |
| Marion-Johnson | 6 | 16,707 | 103.3 | 74,858 | 134.7 |
| Allen-Noble | 2 | 17,256 | 106.7 | 76,837 | 138.3 |
| St. Joseph-Marshall | 2 | 16,285 | 100.7 | 80,521 | 144.9 |
| Lake | 3 | 15,538 | 96.1 | 97,772 | 176.0 |

## APPENDIX C

### (To Statement of Facts)

| County | Adjusted Representation House | Senate | Adjusted Total Rep. | 1960 Voting Population |
|---|---|---|---|---|
| I  *Rural* | | | | |
| Ohio | 0.13 | 0.04 | 0.21 | 2,552 |
| Union | 0.08 | 0.07 | 0.22 | 3,801 |
| Brown | 0.18 | 0.07 | 0.32 | 3,994 |
| Switzerland | 0.26 | 0.08 | 0.42 | 4,433 |
| Warren | 0.09 | 0.18 | 0.45 | 5,068 |
| Crawford | 0.32 | 0.11 | 0.54 | 5,224 |
| Martin | 0.28 | 0.15 | 0.58 | 5,903 |
| Newton | 0.39 | 0.12 | 0.63 | 6,784 |
| Benton | 0.37 | 0.12 | 0.61 | 6,824 |
| Owen | 0.33 | 0.15 | 0.63 | 7,241 |
| Pulaski | 0.41 | 0.13 | 0.67 | 7,450 |
| Scott | 0.36 | 0.22 | 0.80 | 8,165 |
| Pike | 0.24 | 0.31 | 0.86 | 8,323 |

| County | Adjusted Representation | | Adjusted Total Rep. | 1960 Voting Population |
|---|---|---|---|---|
| | House | Senate | | |
| **I   Rural** | | | | |
| Blackford | 0.17 | 0.25 | 0.67 | 8,933 |
| Franklin | 0.39 | 0.18 | 0.75 | 9,375 |
| Parke | 1.00 | 0.37 | 1.74 | 9,390 |
| LaGrange | 0.47 | 0.25 | 0.97 | 9,435 |
| Tipton | 0.19 | 0.19 | 0.57 | 9,470 |
| Spencer | 0.49 | 0.28 | 1.05 | 9,686 |
| Perry | 0.51 | 0.28 | 1.07 | 9,914 |
| Jennings | 0.46 | 0.26 | 0.98 | 9,960 |
| Starke | 0.15 | 0.15 | 0.45 | 10,248 |
| Carroll | 0.28 | 0.25 | 0.78 | 10,272 |
| Jasper | 0.61 | 0.18 | 0.97 | 10,394 |
| Orange | 0.50 | 0.27 | 1.04 | 10,509 |
| Fulton | 0.59 | 0.29 | 1.17 | 10,522 |
| Washington | 0.50 | 0.29 | 1.08 | 10,578 |
| Steuben | 0.53 | 0.29 | 1.11 | 10,592 |
| Harrison | 0.68 | 0.24 | 1.16 | 11,279 |
| Vermillion | 1.00 | 0.41 | 1.82 | 11,487 |
| Fountain | 1.00 | 0.41 | 1.82 | 11,580 |
| Posey | 0.09 | 0.09 | 0.27 | 11,666 |
| White | 0.63 | 0.29 | 1.21 | 11,844 |
| Decatur | 0.54 | 0.23 | 1.00 | 11,940 |
| Rush | 0.29 | 0.26 | 0.81 | 12,071 |
| Whitley | 0.08 | 0.37 | 0.82 | 12,355 |
| Ripley | 0.74 | 0.31 | 1.36 | 12,355 |
| Wells | 0.47 | 0.36 | 1.19 | 12,698 |
| Warrick | 0.11 | 0.11 | 0.33 | 13,920 |
| Jay | 1.00 | 0.44 | 1.88 | 13,960 |
| Sullivan | 1.00 | 0.17 | 1.34 | 14,061 |
| Adams | 0.53 | 0.39 | 1.31 | 14,066 |
| Putnam | 0.67 | 0.43 | 1.53 | 14,687 |
| Dubois | 0.72 | 0.44 | 1.60 | 15,421 |
| Hancock | 0.17 | 0.13 | 0.43 | 15,575 |
| Clay | 1.00 | 0.63 | 2.26 | 15,679 |
| Boone | 1.00 | 0.34 | 1.68 | 16,682 |
| Noble | 1.00 | 0.11 | 1.22 | 16,706 |
| DeKalb | 1.00 | 0.46 | 1.92 | 16,784 |
| Dearborn | 0.87 | 0.43 | 1.73 | 16,928 |
| Greene | 1.00 | 0.31 | 1.62 | 17,145 |
| Randolph | 1.00 | 0.56 | 2.12 | 17,536 |
| Gibson | 1.00 | 0.69 | 2.38 | 18,738 |
| Marshall | 1.00 | 0.12 | 1.24 | 19,082 |
| Morgan | 1.00 | 0.38 | 1.76 | 19,116 |
| Hendricks | 1.00 | 0.47 | 9.94 | 23,304 |
| Hamilton | 1.00 | 0.47 | 1.94 | 23,547 |
| Kosciusko | 1.00 | 0.56 | 2.12 | 24,195 |
| Johnson | 0.06 | 0.06 | 0.18 | 25,059 |
| **II   Semirural** | | | | |
| Fayette | 0.61 | 0.31 | 1.23 | 14,500 |
| Jefferson | 0.64 | 0.26 | 1.16 | 14,824 |

| County | Adjusted Representation House | Adjusted Representation Senate | Adjusted Total Rep. | 1960 Voting Population |
|---|---|---|---|---|
| II *Semirural* | | | | |
| Daviess | 1.00 | 0.38 | 1.76 | 15,893 |
| Jackson | 0.82 | 0.49 | 1.80 | 18,291 |
| Clinton | 1.00 | 0.46 | 1.92 | 18,965 |
| Wabash | 1.00 | 0.44 | 1.88 | 19,287 |
| Montgomery | 1.00 | 0.57 | 2.14 | 19,759 |
| Shelby | 1.00 | 0.43 | 1.86 | 20,401 |
| Huntington | 1.00 | 0.63 | 2.26 | 20,615 |
| Lawrence | 1.00 | 0.58 | 2.16 | 22,232 |
| Miami | 1.00 | 0.36 | 1.72 | 22,524 |
| Knox | 1.76 | 0.62 | 3.00 | 25,889 |
| Cass | 1.72 | 0.71 | 3.14 | 26,077 |
| Bartholomew | 1.00 | 0.52 | 2.04 | 27,850 |
| Henry | 1.71 | 0.24 | 2.19 | 29,480 |
| Floyd | 1.00 | 0.65 | 2.30 | 30,503 |
| Porter | 0.10 | 0.58 | 1.26 | 33,694 |
| Monroe | 1.00 | 0.62 | 2.24 | 34,316 |
| Clark | 1.00 | 0.62 | 2.24 | 35,657 |
| Howard | 1.81 | 0.64 | 3.09 | 40,524 |
| Grant | 1.83 | 1.00 | 3.83 | 44,924 |
| Wayne | 1.92 | 1.00 | 3.92 | 45,523 |
| Tippecanoe | 1.91 | 0.88 | 3.67 | 51,444 |
| LaPorte | 1.85 | 0.85 | 3.55 | 58,407 |
| Elkhart | 2.00 | 1.00 | 4.00 | 62,650 |
| Madison | 2.83 | 1.63 | 6.09 | 75,966 |
| III *Urban* | | | | |
| Delaware | 2.00 | 1.00 | 4.00 | 64,929 |
| Vigo | 3.00 | 1.83 | 6.66 | 68,157 |
| Vanderburgh | 3.80 | 1.80 | 7.40 | 101,805 |
| Allen | 3.92 | 1.89 | 7.70 | 136,967 |
| St. Joseph | 3.00 | 1.88 | 6.76 | 141,959 |
| Lake | 5.90 | 3.00 | 11.90 | 293,316 |
| Marion | 11.94 | 5.94 | 23.82 | 424,090 |

APPENDIX D

(To Statement of Facts)

SENATE ENROLLED ACT NO. 160

"AN ACT fixing and prescribing the number of representatives and senators in the General Assembly of the State of Indiana; and apportioning the same among the several counties of the state.

"*Be it enacted by the General Assembly of the State of Indiana:*

"Section 1. It is hereby declared the intent of the members of the Ninety-third Indiana General Assembly to adopt and to incorporate in this act by reference the official report of the United States federal decennial census, taken in the year 1960, as an honest, true, correct and complete enumeration of the male and female inhabitants of the State of Indiana over the age of twenty-one years; and upon such report is based a legal and valid apportionment of the number of senators and representatives among the several counties of the state, pursuant to the provisions of Article 4, Section 5, of the Constitution of the State of Indiana.

"Sec. 2. For the Ninety-fourth Indiana General Assembly and thereafter the House of Representatives shall consist of one hundred members.

"Sec. 3. Representatives shall be elected from districts, comprised of one or more counties and having one or more representatives, as follows:

Lake County: ten (10) representatives;

Porter County: one (1) representative;

LaPorte County: one (1) representative;

LaPorte and Starke Counties: one (1) representative;

St. Joseph County: five (5) representatives;

Elkhart County: two (2) representatives;

LaGrange and Noble Counties: one (1) representative;

Steuben and DeKalb Counties: one (1) representative;

Allen County: five (5) representatives;

Whitley and Wabash Counties: one (1) representative;

Kosciusko County: one (1) representative;

Marshall and Fulton Counties: one (1) representative;

Newton, Jasper and Pulaski Counties: one (1) representative;

Benton and White Counties: one (1) representative;

Cass County: one (1) representative;

Miami County: one (1) representative;

Wells and Adams Counties: one (1) representative;

Grant County: one (1) representative;

Grant and Blackford Counties: one (1) representative;

Huntington County: one (1) representative;

Howard County: one (1) representative;

Howard and Tipton Counties: one (1) representative;

Carroll and Clinton Counties: one (2) representative;

Tippecanoe County: one (1) representative;

Tippecanoe and Warren Counties: one (1) representative;

Fountain and Montgomery Counties: one (1) representative;

Boone County: one (1) representative;

Hamilton County: one (1) representative;

Madison County: two (2) representatives;

Madison and Hancock Counties: one (1) representative;

Delaware County: two (2) representatives;

Jay and Randolph Counties: one (1) representative;

Wayne County: one (1) representative;

Wayne and Union Counties: one (1) representative;

Henry County: one (1) representative;

Marion County: fifteen (15) representatives;

Hendricks County: one (1) representative;

Parke, Putnam and Owen Counties: one (1) representative;

Vigo County: two (2) representatives;

Vigo and Vermillion Counties: one (1) representative;

Sullivan and Clay Counties: one (1) representative;

Monroe County: one (1) representative;

Morgan and Brown Counties: one (1) representative;

Johnson County: one (1) representative;

Shelby and Rush Counties: one (1) representative;

Fayette and Franklin Counties: one (1) representative;

Ripley and Dearborn Counties: one (1) representative;

Decatur and Jennings Counties: one (1) representative;

Bartholomew County: one (1) representative;

Knox County: one (1) representative;

Greene and Daviess Counties: one (1) representative;

Martin and Lawrence Counties: one (1) representative;

Jackson and Scott Counties: one (1) representative;

Ohio, Switzerland and Jefferson Counties: one (1) representative;

Clark County: one (1) representative;

Floyd County: one (1) representative;

Orange and Washington Counties: one (1) representative;

Crawford and Harrison Counties: one (1) representative;

Perry and Spencer Counties: one (1) representative;

Dubois and Warrick Counties: one (1) representative;

Pike and Gibson Counties: one (1) representative;

Vanderburgh County: three (3) representatives;

Vanderburgh and Posey Counties: one (1) representative.

"Sec. 4. For the Ninety-fourth Indiana General Assembly and thereafter the Senate shall consist of fifty members.

"Sec. 5. Senators shall be elected from districts, comprised of one or more counties and having one or more senators, as follows:

First District — Lake County: four (4) senators;

Second District — Porter, Newton and Jasper Counties: one (1) senator;

Third District — LaPorte and Starke Counties: one (1) senator;

Fourth District — St. Joseph County: two (2) senators;

Fifth District — Elkhart County: one (1) senator;

Sixth District — DeKalb, LaGrange and Steuben Counties: one (1) senator;

Seventh District — Allen County: two (2) senators;

Eighth District — Huntington, Noble and Whitley Counties: one (1) senator;

Ninth District — Kosciuski and Marshall Counties: one (1) senator;

Tenth District — Pulaski, Fulton and Cass Counties: one (1) senator;

Eleventh District — Benton and Tippecanoe Counties: one (1) senator;

Twelfth District — Carroll, Clinton and White Counties: one (1) senator;

Thirteenth District — Howard and Miami Counties: one (1) senator;

Fourteenth District — Grant and Wabash Counties: one (1) senator;

Fifteenth District — Adams, Blackford and Wells Counties: one (1) senator;

Sixteenth District — Jay and Randolph Counties: one (1) senator;

Seventeenth District — Delaware County: one (1) senator;

Eighteenth District — Madison County: one (1) senator;

Nineteenth District — Hancock, Henry and Madison Counties: one (1) senator;

Twentieth District — Boone, Hamilton and Tipton Counties: one (1) senator;

Twenty-First District — Montgomery, Parke and Putnam Counties: one (1) senator;

Twenty-Second District — Fountain, Vermillion and Warren Counties: one (1) senator;

Twenty-Third District — Marion County: five (5) senators;

Twenty-Fourth District — Marion and Johnson Counties: one (1) senator;

Twenty-Fifth District — Wayne and Union Counties: one (1) senator;

Twenty-Sixth District — Fayette, Rush and Shelby Counties: one (1) senator;

Twenty-Seventh District — Hendricks and Morgan Counties: one (1) senator;

Twenty-Eighth District — Vigo County: one (1) senator;

Twenty-Ninth District — Clay, Owen and Sullivan Counties: one (1) senator;

Thirtieth District — Greene, Monroe and Brown Counties: one (1) senator;

Thirty-First District — Bartholomew, Decatur and Franklin Counties: one (1) senator;

Thirty-Second District — Jennings, Ripley, Dearborn and Ohio Counties: one (1) senator;

Thirty-Third District — Clark, Jefferson and Switzerland Counties: one (1) senator;

Thirty-Fourth District — Jackson, Washington and Scott Counties: one (1) senator;

Thirty-Fifth District — Lawrence, Martin and Orange Counties: one (1) senator;

Thirty-Sixth District — Knox and Daviess Counties: one (1) senator;

Thirty-Seventh District — Pike, Gibson and Posey Counties: one (1) senator;

Thirty-Eighth District — Vanderburgh County: one (1) senator;

Thirty-Ninth District — Vanderburgh and Warrick Counties: one (1) senator;

Fortieth District—Dubois, Spencer and Perry Counties: one (1) senator;

Forty-First District — Crawford, Harrison and Floyd Counties: one (1) senator.

"Sec. 6. The senators elected in the general election of 1962 for a term of four years shall continue to hold their office until their term has expired by limitation.

"Sec. 6a. The additional senator provided herein for the First District, Lake County, shall be elected at the general election held in 1964, for a term of two (2) years from the next day after his election.

"Sec. 7. All laws and parts of laws in conflict herewith are repealed; and chapter 78 and chapter 271 of the Acts of 1921 are hereby specifically repealed."

### APPENDIX E

(To Statement of Facts)

### HOUSE ENROLLED JOINT RESOLUTION NO. 6

"A JOINT RESOLUTION proposing an amendment of the Constitution of the State of Indiana by amending sections 3, 4 and 5 of Article 4 of the Constitution and to provide for a decennial reapportionment of the House of Representatives and the Senate.

"WHEREAS, the Ninety-third General Assembly of the State of Indiana recognizes the vital need for a reapportionment of the General Assembly of the State of Indiana; and

"WHEREAS, this General Assembly believes that the majority of the citizens of the State of Indiana desire to establish an apportionment of the House and the Senate of the General Assembly, based on population and on the traditional geographical, governmental, industrial and agricultural areas of the state, the interests of which areas frequently vary or conflict; and

"WHEREAS, this General Assembly firmly believes that the Constitution of the State of Indiana must be

amended to provide for such apportionment of the General Assembly: Therefore,

"*Be it resolved by the General Assembly of the State of Indiana:*

"Section 1. The following amendment to the Constitution of the State of Indiana is hereby proposed and agreed to by this, the Ninety-Third General Assembly of the State of Indiana, and is hereby referred to the next General Assembly for reconsideration and agreement.

"Sec. 2. Section 3 of Article 4 of the Constitution of the State of Indiana is amended to read as follows:

"Sec. 3. Senators shall be elected for the term of four years and Representatives shall be elected for the term of two years, commencing on the day next following their election in such manner as may be provided by law. Provided, however, That the Senators elect and holdover Senators at the first meeting of the General Assembly under this amendment of this Constitution, after apportionment shall divide themselves by lot into two equal classes, as nearly may be; and the seats of Senators of the first class shall be vacated at the expiration of two years, and those of the second class at the expiration of four years, so that one-half, as nearly as possible, shall be chosen biennially thereafter. Provided, That in cases where more than one Senator is elected from a Senatorial district, such Senators shall be divided by lot into two classes, and the terms of the Senators in the first class shall expire in two years and the Senators in the second class shall expire in four years, so that as nearly as possible thereafter, one-half of the Senators within such Senatorial districts shall be chosen biennially. Senators elected to fill vacancies in the Senate shall only serve for and during the unexpired term of the seat to which they are elected.

"Sec. 3. Section 4 of Article 4 of the Constitution of the State of Indiana is amended to read as follows:

"Sec. 4. The census taken in accordance with the provisions of the Constitution of the United States pursuant to congressional enactment in the year 1970, and every ten years thereafter, shall constitute the enumeration for the purpose of apportioning the number of Senators and Representatives as required by this Constitution.

"Sec. 4. Section 5 of Article 4 of the Constitution of the State of Indiana is amended to read as follows:

"Sec. 5. Based upon the enumeration of citizens twenty-one years of age and over of the State of Indiana at the first regular session of the General Assembly next following the year in which the 1970 federal decennial census is promulgated, the number of Representatives shall be fixed by law and apportioned among the several counties according to the number of inhabitants in each county over twenty-one years of age. Thereafter at the session of the General Assembly next following the year in which the census, as prescribed in Section 4 of Article 4 of this Constitution, is taken, the number of Representatives shall be fixed by law and apportioned among the several counties, according to the number of inhabitants over twenty-one years of age in each county.

"At the first regular session of the Indiana General Assembly held next following the year in which the 1970 federal decennial census is promulgated, the number of Senators shall be fixed by law and apportioned among the several counties as follows:

"(a) Each county shall be apportioned one-fifth of a Senator; and

"(b) The balance of the Senators shall be apportioned among the several counties according to the number of citizens twenty-one years of age and over in each county of the State of Indiana as disclosed by the census taken in 1970, as prescribed in Section 4 of Article 4 of this Constitution. Thereafter at the session of the General Assembly next following the year in which the census, as prescribed in Section 4 of Article 4 of this Constitution, is taken the number of Senators shall be fixed by law and appor-

tioned among the several counties in the same manner.

"In creating House and Senatorial districts, any apportionment based upon population shall be as nearly equal as practicable taking into consideration the natural community area as well as the economic conditions within the district.

"In the event any General Assembly, whose duty it is to make an apportionment, shall fail to make the same herein provided, it shall be the duty of the Governor, Secretary of State and Attorney General within thirty (30) days after the adjournment of the General Assembly to make such apportionment and when so made and a proclamation is issued by the Governor announcing such apportionment the same shall have the same force and effect as though made by the General Assembly."

HOLDER, District Judge (separate opinion).

Prior to the decision of Baker v. Carr (1962), 369 U.S. 186, 82 S.Ct. 691, 7 L. Ed.2d 663, the plaintiffs, in Cause Number IP 61–C–236, jointly and severally commenced this action in their own behalf and on behalf of all voters of Indiana similarly situated by filing their complaint on August 2, 1961.[1] This Three-Judge District Court was convened on the 14th of August, 1961, pursuant to Title 28 U.S.C. § 2281 et seq. to hear and determine the action. The complaint was amended on May 25, 1962 following the Baker v. Carr decision of the United States Supreme Court. After the election of and the completion of the regular and special sessions of the 93rd Indiana General Assembly, the plaintiffs filed, on May 17, 1963, their supplemental complaint setting forth transactions, occurrences, and events which had transpired since the filing of their original and amended complaint.

Before the Court for a ruling is the joint motion to dismiss plaintiffs' amended complaint pursuant to Rule 12(b) of the Federal Rules of Civil Procedure filed August 1, 1962 of the following named defendants: Charles O. Hendricks, Secretary of State of the State of Indiana; Members of the State Election Board composed of Matthew E. Welsh, Governor of the State of Indiana, as ex officio Chairman, Edwin M. S. Steers and James E. Noland, as members. Three other motions to dismiss were filed on August 24, 1961 and September 6, 1961 by certain of the named defendants. All of which adopted the same reasons assigned in a previous motion of the Secretary of State and the State Election Board filed August 24, 1961. These three motions were addressed to the original complaint. They were not renewed as to the amended complaint and are no longer in issue.

Upon trial, the evidence consisted of stipulations and admissions in the plead-

1. The Three-Judge United States District Court for the Northern District of Indiana, South Bend Division, dismissed an action of David L. Matthews (one of the plaintiffs herein) seeking to restrain the collection of an Indiana tax based on a law enacted in the 1933 session of the Indiana General Assembly which Mr. Matthews asserted was unconstitutional because of the failure of the Indiana General Assembly to have effected an enumeration and apportionment as provided for in Article IV of the Indiana Constitution. Matthews et al. v. Handley, Governor of the State of Indiana, et al. (1959), D.C., 179 F.Supp. 470; affirmed by the United States Supreme Court on December 7, 1960, 361 U.S. 127, 80 S.Ct. 256, 4 L.Ed.2d 180.

The plaintiffs, Stout et al., have had the legal support and influence of the Indiana Civil Liberties Union since inception of their action. (The summons required the defendants to serve upon Robert D. Risch, Jerome M. Strauss, John Preston Ward and John Wood, plaintiffs' attorneys, whose addresses were listed as c/o Indiana Civil Liberties Union, 704 Fletcher Trust Building, Indianapolis, Indiana.)

No intervening citizen or inhabitant of Indiana other than Mr. Grills has participated in the litigation despite widespread publicity during the two (2) year pendency of the action which seeks extraordinary relief. All of the citizens and inhabitants of Indiana are either in the aggrieved class or the accused favored class referred to in plaintiffs' action.

ings. After trial on the merits of the issues of the amended and supplemental complaints and the answer of the Secretary of State and the State Election Board, the combined arguments were heard on the issues of the motion to dismiss and the merits of the case.

The action is against the named defendants and the class defendants who are the Secretary of State of the State of Indiana, all of the members of the State Election Board, all of the Clerks of the Circuit Courts of the State of Indiana, and all of the members of each of the ninety-two (92) County Election Boards of the State of Indiana. All of the defendants have certain prescribed duties in conduct of elections of the members of the General Assembly of the State of Indiana pursuant to the provision of the Indiana Election Code (Acts of the Indiana General Assembly of 1945, Chapter 208, as amended, being Burns' Indiana Statutes, Section 29–2801 et seq.).[2]

The plaintiffs assert that the Indiana General Assembly in its various sessions since 1927 has failed and refused to follow the mandate of the Indiana Constitution of 1851, as amended, to reapportion itself; that since 1919 (the last enumeration) and since 1921 (the last apportionment) the growth in population has been uneven among the various counties resulting in a dilution and debasement of the voting strength and representation of certain counties, the voters and inhabitants, including plaintiffs, therein, whereas certain other counties and the voters and inhabitants therein have become grossly overrepresented contrary to the express provisions of the Indiana Constitution of 1851, as amended. The plaintiffs further assert that the 93rd Indiana General Assembly failed

and refused to follow the Constitution's mandate in its regular and special session since the United States Supreme Court's decision of Baker v. Carr.[3] The plaintiffs ask this Three-Judge District Court to take jurisdiction of their declaratory judgment action and declare the rights of the plaintiffs pursuant to 72 Stat.L. 349, 28 U.S.C. § 2201, to wit:

1. "a. That the present apportionment of the General Assembly of the State of Indiana has deprived and continues to deprive the plaintiffs of liberty and property without due process of law and has denied and continues to deny to the plaintiffs the equal protection of the laws, in violation of the 14th Amendment to the Constitution of the United States."

2. "b. That Indiana Acts of 1921, Ch. 78, Sec. 2 and Indiana Acts of 1921, Ch. 271, Sec. 2 (Burns' Indiana Statutes, Secs. 34–102 and 34–104) are void and invalid as contrary to the 14th Amendment to the Constitution of the United States, and the Constitution of the State of Indiana, by reason of the failure to reapportion the Legislative districts of the State of Indiana in accordance with the present distribution of population among the various counties of the State as herein alleged."

3. "c. That the right of these plaintiffs to vote in free and equal elections as guaranteed by Article 2, Secs. 1 and 2 of the Constitution of Indiana,

2. The Indiana Election Code was enacted in 1945 by the Indiana General Assembly during the period when it had not complied with Article 4, Sections 4 and 5 of the Indiana Constitution.

3. In its regular session, the 93rd Indiana General Assembly passed a reapportionment bill which was vetoed by the Governor of Indiana and litigation has been

predicted to determine the legality of the veto and the bill. In its special session, the General Assembly passed a Joint Resolution proposing an apportionment basis of members of the Indiana General Assembly by way of an amendment to the Indiana Constitution which is set forth in full as Appendix E to the Statement of Facts, supra.

and the right of plaintiffs to be governed by a General Assembly representative of the people of the State as guaranteed by Article 1, Sec. 1 of the Constitution of the State of Indiana, has been impaired."

and that, after a hearing, further relief be granted plaintiffs pursuant to 62 Stat. L. 964, 28 U.S.C. § 2202, to wit:

4. "a. To restrain the defendants from furnishing forms for nominations, from receiving declarations of candidacy or nomination petitions and papers, from preparation of ballots to be used at primary or general elections in 1962, from certification of nominations or elections, and from any other acts necessary to the holding of elections for members of the Indiana General Assembly in accordance with the districts established by the Indiana Acts of 1921, Ch. 78, Sec. 2 and Ch. 271, Sec. 2 (Burns' Indiana Statutes, Secs. 34–102 and 34–104), until such times as the General Assembly enacts legislation reapportioning the State Senatorial and Representative districts in accordance with the requirements of the Constitution of the State of Indiana."

5. "b. (1) To direct the defendants to declare that the next primary and general elections for members of the Indiana General Assembly shall be held on an at-large basis, and to direct them to take whatever further action is necessary to insure that all candidates for election to the 93rd Indiana General Assembly, scheduled to hold its session in 1963, run at-large throughout the entire State on the following basis: the 100 candidates for the House of Representatives receiving the highest number of votes shall be declared elected to the House of Representatives; and the 50 candidates for the State Senate receiving the highest number of votes shall be declared elected to the State Senate; and said method of election to continue until such time as the Indiana General Assembly enacts legislation reapportioning the State Senatorial and Representative districts in accordance with the requirements of the Constitution of the State of Indiana; or, in the alternative, (2) To direct the defendants to hold the next primary and general elections for members of the 93rd Indiana General Assembly on the basis of new districts established by decree of this Court, through mathematical application of the formulae set out in the Indiana Constitution to the official 1960 federal census population figures for the various counties of the State, and to continue to hold elections on the basis of such new districts, unless and until the Indiana General Assembly enacts legislation reapportioning the Representatives and Senators among the counties of the State as required by the Indiana Constitution."

6. "c. To grant such other or further relief as may seem just, equitable and proper."

The motion to dismiss is grounded on the following specifications:

A. "1. The Complaint, as amended by plaintiff's Amendments to Complaint, fails to state a claim upon which relief can be granted to plaintiffs because the relief sought would be expressly contrary to the Constitution of the State of Indiana, in that such relief would be violative of Art. 2, Sec. 1 and Art. 4, Secs. 2 and 7 thereof."

B. "2. The Complaint, as amended by plaintiffs' Amendments to Complaint, fails to state a claim upon which relief can be granted to plaintiffs because the relief sought would be expressly contrary to the Constitution of the State of Indiana, in that such relief would be violative of Art. 4, Secs. 4 and 5 thereof."

C. "3. The Complaint, as amended by plaintiffs' Amendments to Complaint, fails to state a claim upon which relief can be granted to plaintiffs because the relief sought would be violative of the separation of powers doctrine provided by Art. 3, Sec. 1 of the Indiana Constitution, which doctrine is likewise a vital principle and part of the foundation of our federal government."

Following the Baker v. Carr decision, the plaintiff,[4] in Cause Number IP 62-C-326, commenced this action [5] on August 7, 1962. The action is against the State Election Board of Indiana (one of the defendants in Cause Number IP 61-C-236). The plaintiff in this action also asserts the same factual background as in IP 62-C-236 and claims that his vote is less effective and he is denied an equal voice in the government of the state. He further asserts by reason of a judgment entered March 17, 1961 of the Marion Superior Court, Room Number 5, declaring Chapters 78 and 271 of the 1921 Acts of the Indiana General Assembly unconstitutional and that members of the Senate of the Indiana General Assembly were thereafter without de facto authority to act. That action was brought by Nelson G. Grills, as Senator of the State of Indiana, (the same Mr. Grills suing as an individual in this action) against certain other State Senators. The judgment was not appealed by those defendants. The plaintiff asks this Three-Judge District Court to take jurisdiction of his declaratory judgment action and declare the rights of plaintiff pursuant to 72 Stat.L. 349, 28 U.S.C. § 2201, to wit:

"Wherefore, the plaintiff prays for an order declaring the action of the State Election Board of Indiana in holding an election of members of the General Assembly from districts which have been declared unconstitutional to be unconstitutional and invalid. The plaintiff further prays that pending a hearing upon the merits of this case, a preliminary injunction issue enjoining the defendants from conducting an election in the State of Indiana of members of the General Assembly from districts apportioned under acts which have been declared unconstitutional, that upon a hearing the preliminary injunction be made permanent; the plaintiff be given all such other, further and different relief as this court may deem just and necessary in the premises. * * * "

The defendants filed, on October 8, 1962, an amended motion to dismiss plaintiff's complaint supported by verified evidence. (This motion while designated a motion to dismiss is also in content a motion for summary judgment prescribed by Rule 56 of the Federal Rules of Civil Procedure.) The plaintiff filed, on September 7, 1962, a motion for summary judgment supported by verified evidence.[6] This Court, on October 19, 1962, denied

---

4. The plaintiff is an Indiana attorney and conducted his own litigation.

5. The Court on its own motion consolidated the actions in Cause Number IP 61-C-236 and IP 62-C-326 on November 27, 1962.

6. "AFFIDAVIT ACCOMPANYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
"Nelson G. Grills, being duly sworn, deposes and says:

"1. That I am the Plaintiff in the above entitled cause of action. I have personal knowledge of the matter hereinafter referred to, and make this Affidavit in support of the Plaintiff's motion for a summary judgment.
"2. The Plaintiff is a citizen, elector and taxpayer of the County of Marion, in the State of Indiana.
"3. The Defendant, Matthew E. Welsh is the duly elected Governor of the State of Indiana and as Governor is an ex-

plaintiff's motion for summary judgment insofar as it prayed for a preliminary injunction to restrain defendants from conducting the election for members of

*officio* member of the Indiana State Election Board, and Defendants M. S. Steers and James E. Noland are duly appointed and acting members of the Indiana State Election Board who are charged by the Acts of the Indiana General Assembly of 1945, Chapter 208, Section 11 with the duty of supervising all elections and administering the election laws of the State in their state-wide application and especially as they relate to State elective officers possessing the further duty to formulate, adopt and promulgate rules and regulations governing the conduct of elections and in the event the election code omits any provisions for any act necessary, in the opinion of the State Election Board, for the fair, legal and orderly conduct of any election in the State of Indiana, the Board has the duty to issue proper rulings to correct such omission.

"4. Article 4, Section 1 of the Indiana Constitution provides:

" 'The Legislative authority of the State shall be vested in a General Assembly, which shall consist of a Senate and a House of Representatives.'

"5. Article 4, Section 4 of the Indiana Constitution provides:

" 'The General Assembly shall, at its second session after the adoption of this Constitution, and every sixth year thereafter, cause an enumeration to be made of all male inhabitants over the age of twenty-one years.'

"6. Article 4, Section 5 of the Indiana Constitution provides:

" 'The number of Senators and Representatives shall, at the session next following each period of making such enumeration, be fixed by law, and apportioned among the several counties, according to the number of male inhabitants, above twenty-one years of age, in each * * *.'

"7. The last enumeration made of male inhabitants over the age of twenty-one (21) years was made in the year 1919.

"8. The last apportionment of Senators and Representatives required under Article 4, Section 5 of the Indiana Constitution was made by the General Assembly in the year 1921.

"9. The present apportionment of Senators and Representatives among the several counties is not in accordance with the number of male inhabitants, above 21 years of age living in these counties.

"10. Plaintiff states that the inequality of representation renders not only his vote less effective but the vote of every elector in every county in the State which is provided a lesser number of Senators and Representatives than the population of that county would require is denied an equal voice in the government of the State.

"11. Article 4, Section 9 of the Indiana Constitution provides:

" 'The sessions of the General Assembly shall be held biennially at the capital of the State, commencing on the Thursday next after the first Monday of January, in the year one thousand eight hundred and fifty-three, and on the same day of every second year thereafter, unless a different day or place shall have been appointed by law. But if, in the opinion of the Governor, the public welfare shall require it, he may, at any time, by proclamation, call a special session.'

"12. That on the 29th day of July, 1959, Nelson G. Grills, as State Senator brought an action for a Declaratory Judgment against certain other State Senators in Marion Superior Court, Room No. 5, the cause of action being S59–600. The Attorney General of the State of Indiana was served as required by law and entered his appearance.

"13. That on the 17th day of March, 1961, the Honorable John F. Linder, Judge of the Marion Superior Court, Room No. 5, rendered a judgment in an action brought by Nelson G. Grills, as Senator of the State of Indiana, against certain other Senators which as a Declaratory Judgment declared:

" 'Wherefore, it is declared that:

" '1. Chapters 78 and 271 of the Acts of 1921 are unconstitutional by reason of the apportionment under their terms failing to comply with the requirements of Article 4, Section 5 of the Indiana Constitution.

" '2. Any General Assembly, after the date of this Declaratory Judgment apportioned under the terms of Chapter 78 and Chapter 271 of the Acts of 1921 is declared to be in violation of the act of Congress enabling inhabitants of the territory of Indiana to form a state, approved April 19, 1816, Article 4, Sections 1 and 4 and Article 6, Sections 1 and 2 of the United States Constitution.

" '3. Members of a General Assembly attempting to serve after the date of this judgment, are without de facto authority to act as members of the General Assembly, apportioned under the terms of Chapter 78 and Chapter

the General Assembly of Indiana at the November 6, 1962 election and reserved judgment and ruling on the other issues in plaintiff's and defendants' motions. After trial on the merits, the combined arguments were heard on the issues of the motions and merits of the case.

The defendants do not contest the jurisdiction of the Court over the parties and subject matter of the consolidated actions, nor is there any contest as to the alleged facts. All grounds of defendants' motions are directed against the relief demanded by plaintiffs against these defendants, administrators of Indiana elections. A stipulation of the issues of the pleadings filed by the parties in Cause Number IP 61–C–236, on May 27, 1963, is to this effect.[7] In a statement of the issues of the pleadings filed by the defendants in Cause Number IP 62–C–326, on May 17, 1963, the defendants admit all rhetorical paragraphs except three (3), seven (7) and ten (10) of the plaintiff's affidavit set forth in footnote six (6) of this opinion. Rhetorical paragraph three (3) they specifically deny the implication that defendants might have the power to enumerate and reapportion the Indiana General Assembly. Rhetorical paragraph seven (7) they specifically deny the accuracy of the allegation and assert that enumerations of the male inhabitants were made in 1925 and 1931. Rhetorical paragraph ten (10) they allege is not evidence but is a conclusion of law which conclusion they deny.

When the issues of the cases were resolved to that of appropriate remedy, the Attorney General of the State of Indiana representing the defendants in both actions made the following statement:

"For this Court to successfully effect the reapportionment of this State, in some manner other than relying on the State Legislature, it is essential that the reapportionment be done in a manner that is not subject to criticism of political partisanship. This is so because for any apportionment to be truly effective, it must be accepted by the people of Indiana. The Attorney General is an elected official of the State of Indiana. Any suggestions that he might make, as to an equitable apportionment of the State would, no matter how fair, be subject to cries of partisanship. For this reason,

271 of the Acts of 1921. It therefore follows, that Plaintiff and Defendants are in the same category as all the members of the General Assembly. Costs assessed against the Plaintiff.'

"14. The Defendants, as Members of the State Election Board, under their duties as prescribed by law, are about to and are preparing, unless enjoined by this Court, to conduct an election of members of the General Assembly of the State of Indiana from districts which do not legally exist and which are identical to the districts provided for in Chapter 78 and Chapter 271 of the Acts of 1921 which have been declared unconstitutional."

7. "Whereas at the outset of this suit, the position of the Attorney General of the State of Indiana was that the Legislature of the State of Indiana should reapportion itself pursuant to its Constitutional mandate, and further that, if the Legislature did not reapportion itself, this court had no jurisdiction or Constitutional authority to coerce the Legislature to do so and,

"Whereas since the landmark decision of Baker v. Carr, the defense of the Attorney General's office has been directed toward allowing the State Legislature to reapportion itself and,

"Whereas no rational explanation of the present apportionment in Indiana can be given in terms of the equal protection clause of the 14th amendment to the Constitution of the United States and,

"Whereas all facts which the undersigned parties deem pertinent and relevant to these proceedings have been stipulated now therefore:

"Come now the undersigned parties hereto by their attorneys of record and hereby agree and stipulate that the sole issue before this Court, insofar as such parties are concerned, is what remedies are proper to cause the State of Indiana to be reapportioned.

"The undersigned parties further agree that this stipulation in no way forecloses the full consideration of any additional issues which this Court feels should properly be considered."

the Attorney General, unless ordered to do so by this Court, would respectfully decline to suggest what remedy this Court should follow. His reason for doing this is to give this Court a chance to effect a reapportionment without any taint of political partisanship attached."

Avoiding a dip into the political thicket of remedies, the Attorney General, without suggesting that the Court adopt any of the plaintiffs' proffered remedies, briefed the difficulties of such remedies. While the defendants admit that no rational explanation of the present apportionment in Indiana can be made consistent with the equal protection clause, they suggest it should not be labeled as hostile or invidious discrimination. That such castigation should be reserved for circumstances as disclosed in Gomillion v. Lightfoot, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110. There are other discriminations. The Attorney General further challenges plaintiffs', all inclusive assertions that the 93rd Indiana General Assembly wholly failed to perform its duty under the Indiana Constitution in view of the quoted constitutional amendment and Senate Bill No. 160 referred to in this opinion which plaintiffs assert was legally vetoed. The Attorney General also points out that the plaintiffs' claim, that the lack of equal protection results from the failure to comply with the mandate of the Indiana Constitution when the failure results in discrimination, misses the issue. If apportionment is discriminatory, it would make no difference whether the legislature had followed the Indiana Constitution; to follow the Indiana Constitution might itself amount to a violation of equal protection. Sims v. Frink, 208 F.Supp. 431, (M.D.Ala.1962); Davis v. Synhorst, 217 F.Supp. 492, (S.D. Iowa 1963); and Sincock v. Duffy, 215 F.Supp. 169 (D.Del.1963).

The relief sought by the plaintiffs against the defendants as administors of the elections by-passes the frontal approach of direct action against the Governor of the State. He alone has the power of calling that legislative body into special session with veto and approval power of legislation adopted in such a session. He is not a defendant in his capacity as a Governor although he is a defendant in this case as an election official. Certain of the relief sought seeks this Court to perform the functions of the judicial branch of government and also that of the Governor and the Indiana General Assembly. This power the Court cannot assume.

The State of Indiana was admitted into the Union on December 11, 1816, 3 Stat. 399. It has had Two Constitutions. The last was done in convention on February 10, 1851, effective November 1, 1851, superseding the one of 1816.[8] The 1851 Constitution has been amended[9] and as so amended it was the fundamental law of Indiana at the time of the commencement of this action and to this date. The people of Indiana in execution of their right to a republican form of government in Article 4 of such Constitution vested the legislative authority in the General Assembly consisting of a Senate and a House of Representatives. Its regular and special sessions are limited to sixty-one (61) and forty (40) days respectively. The regular sessions are held biennially and commence on the Thursday next after the first Monday of January the first of which was in the year 1853. Its special sessions are held at any time on proclamation of the Governor when, in the opinion of the Governor, the public welfare shall require it. The members of the Senate cannot exceed fifty (50) and the House of Representatives cannot exceed one hundred (100), each of whom must have been prior to his election an inhabitant of the State for two (2) years and of the county or district whence he or she is chosen for one (1) year. They are chosen by the electors of the respective counties or districts into which the State may, from time to time, be divided. The terms of office of the members of the House of

---

8. See Appendix A.

9. See Appendix B for those amendments pertinent to this case.

Representatives are for the term of two (2) years and the members of the Senate are for the term of four (4) years with one-half of the Senators chosen biennially.

Prior to March, 1881, the constitutional basis of apportioning representation was "white male" inhabitants, above twenty-one (21) years of age. The electors were also limited to "white male" citizens who satisfied certain age and residence requirements.[10] The Fifteenth Amendment to the Constitution of the United States, effective March 30, 1870, (ratified by the State of Indiana on May 14, 1869) precipitated the amendment of the Indiana Constitution in March, 1881, by deleting "white male" and establishing the basis of apportioning on the "male" inhabitants over the age of twenty-one (21) years. The qualifications of electors were also changed to "male" citizens otherwise qualified.[11] The Nineteenth Amendment to the Constitution of the United States, effective August 26, 1920, (ratified by the State of Indiana on January 16, 1920) precipitated the amendment of the Indiana Constitution in September, 1921, by deleting the "male" qualification of electors so that thereafter "every citizen" (including women) who had certain age and residence requirements became a qualified elector.[12] No change has been made in Article 4, Sections 4 and 5, of the Constitution of Indiana since the Nineteenth Amendment to the Constitution of the United States and the amendment to Article 2, Section 2, of the Constitution of Indiana. The basis of apportionment of the members of the Indiana General Assembly has continued to be on the enumeration of the male inhabitant while their electors are men and women of all races, creeds and colors, and both men and women are qualified to seek and hold office as members of the Indiana General Assembly.

The last apportionment made under Sections 4 and 5 of Article 4 of the Constitution of Indiana was by the General Assembly's 1921 Acts, being Chapter 78 and Chapter 271. Such was based on the 1919 enumeration of male inhabitants above twenty-one (21) years of age. No apportionment has been made including women inhabitants in the enumeration. All members of the Indiana General Assembly since 1921 have been selected and elected under the districting apportioned in the 1921 Acts so based on the 1919 enumeration of the male inhabitants, including those nominated in the May 1962 primary, candidates on the ballots in the November 1962 election, and those elected in the November 1962 election.

The Constitution of Indiana contains no provision for initiative or referendum by which the electors could apportion. It can be amended only by passage of a proposed amendment by the House of Representatives and the Senate at two successive regular sessions prior to submission of any such amendment to the electors.[13] A constitutional convention cannot be called unless the General Assembly submits such question to the electors. Action on enumeration and apportionment is therefore dependent upon the General Assembly under the Constitution of Indiana.[14]

The inhabitant referred to in Sections 4 and 5 of Article 4 of the Indiana Constitution of 1851 referred to an inhabitant with all political privileges. Inhabitant as used therein was not synonymous with an elector. A male inhabitant would have been enumerated even though

---

10. See Article 4, Sections 4 and 5, and Article 2, Section 2, Constitution of Indiana of 1851 in Appendix A.

11. See Article 4, Sections 4 and 5, and Article 2, Section 2, Constitution of Indiana as amended in 1881 in Appendix B.

12. See Article 2, Section 2, Constitution of Indiana as amended in 1921 in Appendix B.

13. See Article 16, Section 1, Constitution of Indiana in Appendix A.

14. State of Indiana ex rel. Welsh v. Marion Superior Court, Room 5, et al., (1962), Ind., 185 N.E.2d 18.

he was not a qualified elector, or may never be such as defined in Article 2 of the Indiana Constitution. Inhabitant as used therein was not synonymous with citizen. Women were expressly excluded and for a while after the 1851 Constitution negroes were also expressly excluded by the limitation "white male inhabitant".

Women inhabitants of Indiana were citizens of Indiana and the United States long before the adoption of the Fourteenth and Nineteenth Amendments to the United States Constitution. Minor v. Happersett, Mo., 21 Wall. 162, 22 L.Ed. 627. They did not then possess one of the political privileges of the male citizen, the right to vote. The Fourteenth Amendment reaffirmed the status of women as citizens of Indiana, but it did not qualify her for the status of an inhabitant of Indiana for the enumeration and apportionment purposes of Article 4, Sections 4 and 5 of the Indiana Constitution which expressly excluded her by the limitation "male inhabitant". Such sections were not repugnant to the amendment. The Fourteenth Amendment's equal protection clause, when adopted, had no effect on the exclusion of women from such sections of Article 4 of the Indiana Constitution and such sections were not repugnant to the amendment. The Fourteenth Amendment cannot be said to have been intended, when adopted, to supersede Sections 4 and 5 of Article 4 of the Indiana Constitution.

The Constitution of the United States never has and does not now prescribe the factors of enumeration and apportionment of the legislative bodies of the states. The choice is left to the State of Indiana to have a bicameral or unicameral legislature, the number of officials, the districting thereof according to population, geography, units of government, economic welfare of the State and many other factors. Such choice must be based on reason and just need and has been termed "rationally explainable". Any choice that is not so rationally explainable brings into focus the equal protection clause. A reading of the delegates'

debates in the constitutional convention which authored the 1851 Constitution of Indiana discloses the factors of choice. The debates also expose the political compromises necessary to reach a rationally explainable choice. It is obvious from the pleadings and briefs of the uncertainty, if not inability, of one man, let alone one hundred (100) Representatives and fifty (50) Senators to have a meeting of mind and in good faith to propose an equitable plan unshaded by prejudices or the emphasizing of one or more factors.

The adoption of the Fifteenth and Nineteenth Amendments to the United States Constitution, referring to the right to vote, and the State of Indiana Amended Article 2, Section 2, of its Constitution, provided that all citizens with uniform qualifications are electors. Thus, the subject of the Fifteenth and Nineteenth Amendments was electors not apportionment or the enumerating of inhabitants who are not even electors, but some of whom are potential electors. The Nineteenth Amendment itself cannot be said to have been intended, when adopted, to supersede Sections 4 and 5 of Article 4 of the Indiana Constitution. The Nineteenth Amendment does not of itself make the provisions of Article 4, Sections 4 and 5, repugnant and thus supersede them.

Indiana has persistently through the administrations of many Governors and sessions of the Indiana General Assembly ignored the rights of women inhabitants to be enumerated and apportionment made thereon. Even the plaintiffs in their actions seek enforcement of enumeration of "male inhabitants" and thereby excluding women. In the 93rd session of the Indiana General Assembly, legislation was introduced which among other things provided for the inhabitants to be enumerated to include women and thus ignoring the provisions of Article 4, but such bill failed. The quoted constitutional amendment resolved by the special session of the 93rd Indiana General Assembly again demonstrates an unwillingness to merely include women inhabitants without effecting other basic changes.

Such long inaction through many administrations depicts major public dissatisfaction with the whole of the provisions of Article 4, Sections 4 and 5 of the Indiana Constitution. The function of the Court is to only interpret and apply the law. Article 4, Sections 4 and 5, were never intended to include women and have never been superseded. The whole of Sections 4 and 5 must stand the legal test of constitutionality.

The heart of the relief sought by the plaintiffs is dependent on Article 4 of the Indiana Constitution. Plaintiffs claim that the two Acts of 1921 creating the districts are unconstitutional because of the Indiana General Assembly's failure since 1927 to enumerate and apportion in accordance with Article 4, Sections 4 and 5 of the Indiana Constitution. Plaintiffs, in Cause Number IP 61–C–236, also ask this Court to enumerate and apportion (in various alternative demands) in accordance with such Article 4, Sections 4 and 5. The Indiana Supreme Court has never passed upon the constitutionality of the 1921 Acts and Article 4, Sections 4 and 5 of the Indiana Constitution, although by the late case of State of Indiana ex rel. Welsh v. Marion Superior Court, Room 5, et al., (1962), Ind., 185 N.E.2d 18, the Supreme Court of Indiana held that the Indiana State Election Board was not vested with the power and authority to make a reapportionment of the Indiana General Assembly as the power to apportion is by the Constitution vested solely in that body. Thirty-six (36) years of confusion, inaction and the avoidance of presenting the constitutional apportionment issue to the Indiana Supreme Court for decision should impel this Court to reach such issue in this case. It will arise in future litigation with the known multiplicity of apportionment actions. There are prevalent doubts of the legality of the election of the members of the Indiana General Assembly in the immediate future. The manifest public importance of the issue requires a basic precedent for the immediate future guidance of Indiana officials and its citizens. Sections 4 and 5 of Article 4 of the Indiana Constitution deny the citizens of Indiana, whose inhabitants and electors include women, the equal protection of the laws of Indiana. Discrimination between the sexes for the apportionment of membership of the General Assembly is an unnatural and unreasonable classification. The exclusion of women inhabitants as a class is discriminatory and just as unreasonable as would be any class exclusion because of an inhabitant's race, creed or color. This discrimination is present by reason of the recited altering and reforming of selected articles and sections of the Constitution and the failure to make changes in Article 4, Sections 4 and 5. The provisions of Section 2 of Chapter 78 and Section 2 of Chapter 271 of the 1921 Acts of the Indiana General Assembly also deny the citizens of Indiana the equal protection of the laws of Indiana for the same reason.

The 1921 Apportionment Acts were not void ab initio. The actual existence of such Acts prior to this determination is an operative fact which has consequences which cannot be ignored. The past, present and future effect of such Acts cannot be erased by this Court's judgment under the circumstances of this case. Chicot County Drainage Dist. v. Baxter State Bank, (1940) 308 U.S. 371, 60 S.Ct. 317, 84 L.Ed. 329; Missouri Utilities Co. v. City of California, Mo., D.C., 8 F.Supp. 454; 8 Cir., 79 F.2d 1003; Phipps v. School District of Pittsburgh, 3 Cir., 111 F.2d 393; J. A. Dougherty's Sons v. Commissioner of Internal Revenue, 3 Cir., 121 F.2d 700; and Warring v. Colpoys, 74 App.D.C. 303, 122 F.2d 642, 136 A.L.R. 1025. The circumstances facing Indiana are clear without prolonging this opinion. Without the districts created by the 1921 Acts, there would be no legislative body. The governmental needs of the State of Indiana require the existence of a legislative body. No court or any other agency of government can legislate new districts or otherwise perform the legislative powers of the Indiana General Assembly

provided for in Article 4 of the Indiana Constitution.[15] The practical as well as the theoretical effect of an immediate enjoining of the defendants in their election duties would be chaos in Indiana's organized government. The districts established by the apportionment acts prior to the 1921 Acts are invalid for the same reason, and they cannot be utilized or rejuvenated, nor can redistricting be accomplished under Article 4, Sections 4 and 5 of the Indiana Constitution by emergency legislation as such new legislation would be accused of being, if not actually, void ab initio.

I respectfully disagree with my senior colleagues of the Court as to their express or implied approval of the validity of Article 4, Sections 4 and 5 of the Indiana Constitution. Decision on this question is necessary now in the determination of those issues reached today and will be material to a determination of the postponed decision of the issues of other relief requested by the plaintiffs. Likewise the determination is material for a legislature who will apportion in the future.

When apportionment is made on the enumeration of the male inhabitants as prescribed by Article 4, Sections 4 and 5, and districts are created as prescribed by Article 4, Section 6, there of necessity must be an allowable tolerance. That is, no two districts will have the same number of male inhabitants but they will have the same proportionate number of Senators and Representatives. No two districts will have the same number of women inhabitants and when the male tolerance is added to the excess women of the same district over the other district you have quite a surplus. For example, Marion County has 25,000 more women than men; Vanderburgh County has 7,657 more women than men; Lake County has 2,070 less women than men; Tippecanoe County has 378 less women than men; and Madison has 2,334 less women than men. There are other ex-

amples all over the State in the 1930, 1940, 1950 and 1960 census. See Appendix "C". When tolerances are compounded the result is substantial discrimination against women in the various counties. According to the 1960 census Lake County had 147,693 male inhabitants over the age of twenty-one years, which I will call District "A". I have assembled a District "B" composed of twelve (12) counties whose male inhabitants over the age of twenty-one years total 150,025 in an effort to comply with Article 4, Sections 4 and 5 and to comply with the whole county and contiguous counties provisions of Article 4, Section 6. A so-called slight variance or tolerance exists of 2,332 male inhabitants in District "B" that does not violate the Fourteenth Amendment. However, because of Indiana's constitutional discrimination against women, the 145,623 women inhabitants over the age of twenty-one of District "A", according to the 1960 census, were not enumerated and the 162,757 women inhabitants over the age of twenty-one of District "B", according to the 1960 census, were not enumerated. Thus, another variance of 17,134 female inhabitants exist in District "B" and a compounded variance total of 19,466 in District "B". See Appendix "D". The objective of Article 4, Sections 4 and 5, when adopted was to enumerate all inhabitants with political privileges. When the negro received political privileges, these sections were amended. When women received political privileges, such sections were not changed and the objective of Sections 4 and 5 is being ignored. The essential difference between the constitutional provisions of Article 4, Sections 4 and 5, and any apportionment statute (be it the 1921 Acts or the 1965 Acts) is that a constitution generally states principles and establishes a foundation of law and government, whereas, a statute must provide details of the subject of which it treats. Article 4, Sections 4 and 5, unlike an apportionment stat-

15. State of Indiana ex rel. Welsh v. Marion Superior Court, Room 5, et al., (1962) Ind., 185 N.E.2d 18.

ute, are intended not merely to meet existing conditions but to govern future contingencies. There is no proviso clause in Article 4, Sections 4 and 5, to the effect that enumeration and apportionment will be based on the male inhabitants so long as the variance of men to women is inconsequential; and that when the variance is significant apportionment will be based on both men and women. To leave Article 4, Sections 4 and 5 on the books is to require future legislatures to enumerate only the males and apportion thereon—they are not a court. Do they have the authority to count men only at one time and the next time to disregard Article 4, Sections 4 and 5 and count men and women? Also keep in mind how long it takes for the people of Indiana to amend Article 4, Sections 4 and 5, and in the meantime enumeration and apportionment is over. Our stamp of approval will mislead governmental officials and the public now and in the future. The evidence before us discloses the possible confusion that reigned in the general session of the Indiana General Assembly in 1963. There was a bill introduced which clearly ignored the mandate of Article 4, Sections 4 and 5, because it sought to enumerate and apportion on the basis of both male and female inhabitants. The bill failed. It is reasonable to believe that sufficient members of the legislature refused to consider the bill because it was contrary to the express terms of Article 4, Sections 4 and 5. The women as a class of Indiana inhabitants cannot have considered at any time a legislative enactment to enumerate them with the males and apportion accordingly because of Article 4, Sections 4 and 5. Women have never been, are not now and never will be enumerated and apportionment has never been, is not now and never will be inclusive of them because of Article 4, Sections 4 and 5. These are facts, discriminatory facts, that have existed in the past, present and future. The use of the so-called "ideal district" as the starting premise as presented by plaintiffs ignores essen-

tial and material factors of enumeration and apportionment. This device of statistical proof overlooks those factors saddled onto the Indiana General Assembly. For example, but not in limitation of other constitutional factors, Article 4 of the Indiana Constitution forbids the division of a county in setting up a district and requires that where more than one county comprise a district that such counties must be contiguous. Plaintiffs use of the "ideal district" amounts to no more than "State Arithmetic", a system of computing by which differences between individuals, groups and classes are eliminated by the taking of an average. If such statistics prevail then the liberty and individuality of women as a group or class in Indiana will be emasculated. The very discrimination complained of by the named four male plaintiffs. The accuracy of plaintiffs arithmetic is not equivalent to the accuracy of knowledge that when a legislature apportions and creates districts that districts will be substantially over represented and others will be substantially under-represented; also that if women were enumerated, the makeup of counties in districts will be substantially different than where men only are enumerated.

The Indiana Constitution contemplates continuity of its organized government until the constituted branch of government effects the necessary changes. The 93rd Indiana General Assembly and its membership is an accomplished fact. The districts under the 1921 Acts are in effect now and in the future for such reasonable time as is necessary to legislate new districts contemplated by Article 4 of the Indiana Constitution exclusive of its unconstitutional Sections 4 and 5. Time must be measured by the constitutional requirements of time needed to either enact legislation or amend the Constitution or both, or effect a new Constitution in convention. It is the Indiana Constitution that controls time requirements. The power to precipitate this lies in the Governor by calling a special session of the Indiana General

Assembly when in his discretion the welfare of the State demands it and the power to enact or initiate such is in the Indiana General Assembly. The members of the Indiana General Assembly and the Governor of Indiana by this decree are entitled to be informed of the status of the districts whereas individual opinion heretofore prevailed. The time required to accomplish the amendment initiated in the past special session of the 93rd General Assembly is too long to justify the continued constitutional infringements on the citizens of Indiana and there is a need for interim relief by legislative action pending the progress of such constitutional amendment. There is sufficient constitutional authority in Article 4 of the Indiana Constitution without reliance on the unconstitutional Sections 4 and 5 thereof to enact a law creating legislative districts within which to conduct an election for the membership of the 94th or 95th Indiana General Assembly. Sufficient time may exist for the Governor and the Indiana General Assembly to take affirmative action to replace the 1921 Acts before the 1964 elections, however, such time issue is not before the Court. Judicial notice is taken of the fact that vacancies exist in the membership of the Indiana General Assembly which leaves certain districts unrepresented should a special session of the General Assembly be called and convened. Judicial notice is taken of the practical problems of the Governor and of the Indiana General Assembly under Indiana's Constitution and cannot in the interest of all citizens of the State so limit the time for accomplishment of the forging of new districts by granting an injunction against these election official defendants from conducting an election of the members of the 94th General Assembly approximately six (6) months hence. It should be contemplated that appeals may be taken from this Court's ruling. Organized government in Indiana will suffer with the prevalent doubts pending appeal which may not be concluded until a decision of the Supreme Court of the United States, at the very earliest, in the middle of the election year of 1964. Because the Governor and the members of the 93rd Indiana General Assembly are not parties to this action and the consequent lack of evidence pertaining to the possible issues that would be present, the Court should refrain from considering the equities or practicalities now facing the Governor in the decision, which is his under the Constitution, of whether or not the public welfare of the State now or at any time demands that he proclaim a special session of the 93rd Indiana General Assembly. Some of the facts which he no doubt will and has considered have been referred to and no doubt there are many more factual practical considerations upon which the Court need not speculate.

The judgment of The Marion Superior Court, Room Number 5, rendered March 17, 1961, is not a binding precedent on this Court or on these defendants, the members of the State Election Board of Indiana, as they were not parties to that action and the issues were not the same as presented in this action. Furthermore, none of the parties to that judgment sought or hold the office of Senator at or as a result of the November 1962 election. The notice to and the appearance of the Attorney General of Indiana in such action does not bind these defendants or the State of Indiana to such judgment.

Therefore, it is the considered judgment of this member of the Court that the defendants should be enjoined from conducting a primary and election in 1966 for members of the 95th Indiana General Assembly in the legislative districts created by the 1921 Acts, Section 2 of Chapters 78 and 271 and under the provisions of Article 4, Sections 4 and 5 of the Indiana Constitution and from enforcing such sections of such chapters of the 1921 Acts and Sections 4 and 5 of Article 4 of the Indiana Constitution.

The parties should be ordered to within ten (10) days submit an appropriate injunction entry for the Court's con-

sideration for service on the named defendants and each of the class defendants with a roster including addresses of each of the class defendants.

The motions of the defendants in both cases should be denied. The motion of the plaintiff in Cause Number IP 62-C-326 should be denied.

## APPENDIX A

(To Separate Opinion of Judge Holder)

### CONSTITUTION OF STATE OF INDIANA

#### 1851

#### Preamble

To the end, that justice be established, public order maintained, and liberty perpetuated: We, the People of the State of Indiana, grateful to Almighty God for the free exercise of the right to choose our own form of government, do ordain this Constitution.

### Article 1

#### BILL OF RIGHTS

§ 1. Natural rights.—We Declare, That all men are created equal; that they are endowed by their Creator with certain unalienable rights; that among these are life, liberty and the pursuit of happiness; that all power is inherent in the People; and that all free governments are, and of right ought to be, founded on their authority, and instituted for their peace, safety, and well-being. For the advancement of these ends, the People have, at all times, an indefeasible right to alter and reform their government.

§ 12. Courts open—Due course of law—Administration of justice.—All courts shall be open; and every man, for injury done to him in his person, property, or reputation, shall have remedy by due course of law. Justice shall be administered freely, and without purchase; completely, and without denial; speedily, and without delay.

§ 23. Privileges equal.—The General Assembly shall not grant to any citizen, or class of citizens, privileges or immunities which, upon the same terms, shall not equally belong to all citizens.

§ 25. Taking effect of laws.—No law shall be passed, the taking effect of which shall be made to depend upon any authority, except as provided in this Constitution.

§ 26. Suspension of laws.—The operation of the laws shall never be suspended, except by the authority of the General Assembly.

§ 31. Right to assemble, instruct, and petition.—No law shall restrain any of the inhabitants of the State from assembling together in a peaceable manner, to consult for their common good; nor from instructing their representatives; nor from applying to the General Assembly for redress of grievances.

### Article 2

#### SUFFRAGE AND ELECTIONS

§ 1. Elections free and equal.—All elections shall be free and equal.

§ 2. Qualifications of electors.—In all elections, not otherwise provided for by this Constitution, every white male citizen of the United States, of the age of twenty-one years and upwards, who shall have resided in the State during the six months immediately preceding such election; and every white male, of foreign birth, of the age of twenty-one years and upwards, who shall have resided in the United States one year, and shall have resided in this State during the six months immediately preceding such election, and shall have declared his intention to become a citizen of the United States, conformably to the laws of the United States on the subject of naturalization, shall be entitled to vote in the township or precinct where he may reside.

§ 3. Soldiers—Seamen—Marines.—No soldier, seaman, or marine, in the army or navy of the United States, or of their allies, shall be deemed to have acquired a residence in the State, in consequence of having been stationed within the same; nor shall any such soldier, seaman, or marine have the right to vote.

§ 4. Residence.—No person shall be deemed to have lost his residence in the State by reason of his absence, either on business of this State or of the United States.

§ 8. Disfranchisement.—The General Assembly shall have power to deprive of the right of suffrage, and to render ineligible, any person convicted of an infamous crime.

§ 9. Effect of holding lucrative offices—No person holding a lucrative office or appointment under the United States or under this State, shall be eligible to a seat in the General Assembly; nor shall any person hold more than one lucrative office at the same time, except as in this Constitution expressly permitted: Provided, that offices in the militia to which there is attached no annual salary, and the office of Deputy Postmaster where the compensation does not exceed ninety dollars per annum, shall not be deemed lucrative: And provided, also, that counties containing less than one thousand polls, may confer the office of Clerk, Recorder, and Auditor, or any two of said offices, upon the same person.

§ 12. Electors free from arrest.—In all cases, except treason, felony, and breach of the peace, electors shall be free from arrest, in going to elections, during their attendance there, and in returning from the same.

§ 13. Method of election.—All elections by the People shall be by ballot; and all elections by the General Assembly, or by either branch thereof, shall be viva voce.

§ 14. Time of elections.—All general elections shall be held on the second Tuesday in October.

### Article 3

#### DISTRIBUTION OF POWERS.

§ 1. Three departments.—The powers of the Government are divided into three separate departments; the Legislative, the Executive including the Administrative, and the Judicial; and no person, charged with official duties under one of these departments, shall exercise any of the functions of another, except as in this Constitution expressly provided.

### Article 4

#### LEGISLATIVE.

§ 1. The general assembly.—The Legislative authority of the State shall be vested in the General Assembly, which shall consist of a Senate and a House of Representatives. The style of every law shall be: "Be it enacted by the General Assembly of the State of Indiana"; and no law shall be enacted, except by bill.

§ 2. Number of members.—The Senate shall not exceed fifty, nor the House of Representatives one hundred members; and they shall be chosen by the electors of the respective counties or districts, into which the State may, from time to time, be divided.

§ 3. Term of office.—Senators shall be elected for the term of four years, and Representatives for the term of two years, from the day next after their general election: Provided, however, that the Senators elect, at the second meeting of the General Assembly under this Constitution, shall be divided, by lot, into two equal classes, as nearly as may be; and the seats of Senators of the first class shall be vacated at the expiration of two years, and those of the second class, at the expiration of four years; so that one-half, as nearly as possible, shall be chosen biennially forever thereafter. And in case of increase in the number of Senators, they shall be so annexed, by lot, to one or the other of the two classes, as to keep them as nearly equal as practicable.

§ 4. Periodical enumeration.—The General Assembly shall, at its second session after the adoption of this Constitution, and every six years thereafter, cause an enumeration to be made of all the white male inhabitants over the age of twenty-one years.

§ 5. Apportionment of representation.—The number of Senators and Representatives shall, at the session next

following each period of making such enumeration, be fixed by law, and apportioned among the several counties, according to the number of white male inhabitants, above twenty-one years of age, in each: Provided, that the first and second elections of members of the General Assembly, under this Constitution, shall be according to the apportionment last made by the General Assembly, before the adoption of this Constitution.

§ 6. Districts.—Requirements as to divisions.—A Senatorial or Representative District, where more than one county shall constitute a district, shall be composed of contiguous counties; and no county, for Senatorial apportionment, shall ever be divided.

§ 7. Qualifications of members of assembly.—No person shall be a Senator or a Representative who, at the time of his election, is not a citizen of the United States; nor any one who has not been for two years next preceding his election, an inhabitant of this State, and, for one year next preceding his election, an inhabitant of the county or district, whence he may be chosen. Senators shall be at least twenty-five, and Representatives at least twenty-one years of age.

§ 8. Privileges of members.—Senators and Representatives, in all cases except treason, felony, and breach of the peace, shall be privileged from arrest, during the session of the General Assembly, and in going to and returning from the same; and shall not be subject to any civil process, during the session of the General Assembly, nor during the fifteen days next before the commencement thereof. For any speech or debate in either House, a member shall not be questioned in any other place.

§ 9. Sessions.—The sessions of the General Assembly shall be held biennially at the capital of the State, commencing on the Thursday next after the first Monday of January, in the year one thousand eight hundred and fifty three, and on the same day of every second year thereafter, unless a different day or place shall have been appointed by law. But if, in the opinion of the Gov-ernor, the public welfare shall require it, he may, at any time by proclamation, call a special session.

§ 10. Officers—Procedure—Adjournment.—Each House, when assembled, shall choose its own officers, the President of the Senate excepted; judge the elections, qualifications, and returns of its own members; determine its rules of proceeding, and sit upon its own adjournment. But neither House shall, without the consent of the other, adjourn for more than three days, nor to any place other than that in which it may be sitting.

§ 11. Quorum.—Two-thirds of each House shall constitute a quorum to do business; but a smaller number may meet, adjourn from day to day, and compel the attendance of absent members. A quorum being in attendance, if either House fail to effect an organization within the first five days thereafter, the members of the House so failing, shall be entitled to no compensation, from the end of the said five days until an organization shall have been effected.

§ 12. Journal.—Each House shall keep a journal of its proceedings, and publish the same. The yeas and nays, on any question, shall, at the request of any two members, be entered, together with the names of the members demanding the same, on the journal; Provided, that on motion to adjourn, it shall require one-tenth of the members present to order the yeas and nays.

§ 13. Doors to be open.—The doors of each House, and of Committees of the Whole, shall be kept open, except in such cases, as, in the opinion of either House, may require secrecy.

§ 14. Disorderly behavior punished.—Either House may punish its members for disorderly behavior, and may, with the concurrence of two-thirds, expel a member; but not a second time for the same cause.

§ 15. Imprisonment for contempt.—Either House, during its session, may punish, by imprisonment, any person not a member, who shall have been guilty of disrespect to the House, by disorderly

or contemptuous behavior, in its presence; but such imprisonment shall not, at any one time, exceed twenty-four hours.

§ 16. Powers of each house.—Each House shall have all powers, necessary for a branch of the legislative department of a free and independent State.

§ 17. Bills.—Bills may originate in either House, but may be amended or rejected in the other; except that bills for raising revenue shall originate in the House of Representatives.

§ 18. Reading and vote.—Every bill shall be read, by sections, on three several days, in each House; unless, in case of emergency, two-thirds of the House where such bill may be depending, shall, by a vote of yeas and nays, deem it expedient to dispense with this rule; but the reading of a bill, by sections, on its final passage, shall, in no case, be dispensed with; and the vote on the passage of every bill or joint resolution shall be taken by yeas and nays.

§ 20. Plain wording.—Every act and joint resolution shall be plainly worded, avoiding, as far as practicable, the use of technical terms.

§ 23. Laws must be general.—In all the cases enumerated in the preceding Section, and in all other cases where a general law can be made applicable, all laws shall be general, and of uniform operation throughout the State.

§ 25. Passage of bills.—A majority of all the members elected to each House, shall be necessary to pass every bill or joint resolution; and all bills and joint resolutions so passed, shall be signed by the Presiding Officers of the respective Houses.

§ 26. Protest and entry.—Any member of either House shall have the right to protest, and to have his protest, with his reasons for dissent, entered on the journal.

§ 27. Public laws.—Every statute shall be a public law, unless otherwise declared in the statute itself.

§ 28. Effective date of statutes.— No act shall take effect, until the same shall have been published and circulated in the several counties of this State, by authority, except in case of emergency; which emergency shall be declared in the preamble, or in the body, of the law.

§ 29. Pay of members—Duration of sessions.—The members of the General Assembly shall receive for their services, a compensation to be fixed by law; but no increase of compensation shall take effect during the session at which such increase may be made. No session of the General Assembly, except the first under this Constitution, shall extend beyond the term of sixty-one days, nor any special session beyond the term of forty days.

§ 30. Members ineligible to certain offices.—No Senator or Representative shall, during the term for which he may have been elected, be eligible to any office, the election to which is vested in the General Assembly; nor shall he be appointed to any civil office of profit, which shall have been created, or the emoluments of which shall have been increased, during such term; but this latter provision shall not be construed to apply to any office elective by the People.

## Article 5

### EXECUTIVE

§ 1. Governor.—The executive power of the State shall be vested in a Governor. He shall hold his office during four years, and shall not be eligible more than four years, in any period of eight years.

§ 3. Election.—The Governor and Lieutenant Governor shall be elected at the times and places of choosing members of the General Assembly.

§ 4. Manner of voting.—In voting for Governor and Lieutenant Governor, the electors shall designate for whom they vote as Governor, and for whom as Lieutenant Governor. The returns of every election for Governor and Lieutenant Governor shall be sealed up and transmitted to the seat of government, directed to the Speaker of the House of Representatives, who shall open and publish them in the presence of both Houses of the General Assembly.

§ 5. Plurality elects.—The persons, respectively, having the highest number of votes for Governor and Lieutenant Governor, shall be elected; but in case two or more persons shall have an equal and the highest number of votes for either office, the General Assembly shall, by joint vote, forthwith proceed to elect one of the said persons Governor or Lieutenant Governor as the case may be.

§ 6. Contests.—Contested elections for Governor or Lieutenant Governor, shall be determined by the General Assembly, in such manner as may be prescribed by law.

§ 9. Term of office.—The official term of the Governor and Lieutenant Governor shall commence on the second Monday of January, in the year one thousand eight hundred and fifty-three; and on the same day every fourth year thereafter.

§ 10. Vacancies.—In case of the removal of the Governor from office, or of his death, resignation, or inability to discharge the duties of the office, the same shall devolve on the Lieutenant Governor; and the General Assembly shall, by law, provide for the case of removal from office, death, resignation, or inability, both of the Governor and Lieutenant Governor, declaring what officer shall act as Governor; and such officer shall act accordingly, until the disability be removed or a Governor be elected.

§ 12. Governor—Commander-in-chief. —The Governor shall be commander-in-chief of the military and naval forces, and may call out such forces, to execute the laws, or to suppress insurrection, or to repel invasion.

§ 13. Messages—He shall, from time to time, give to the General Assembly information touching the condition of the State, and recommend such measures as he shall judge to be expedient.

§ 14. Bills signed or vetoed.—Every bill which shall have passed the General Assembly, shall be presented to the Governor; if he approve, he shall sign it; but if not, he shall return it, with his objections, to the House in which it shall have originated; which House shall enter the objections, at large, upon its journals, and proceed to reconsider the bill. If, after such reconsideration, a majority of all the members elected to that House shall agree to pass the bill, it shall be sent, with the Governor's objections, to the other House, by which it shall likewise be reconsidered; and, if approved by a majority of all the members elected to that House, it shall be a law. If any bill shall not be returned by the Governor within three days, Sunday excepted, after it shall have been presented to him, it shall be a law, without his signature, unless the general adjournment shall prevent its return; in which case it shall be a law, unless the Governor, within five days next after such adjournment, shall file such bill, with his objections thereto, in the office of Secretary of State; who shall lay the same before the General Assembly at its next session, in like manner as if it had been returned by the Governor. But no bill shall be presented to the Governor, within two days next previous to the final adjournment of the General Assembly.

§ 18. Vacancies filled by governor. —When, during a recess of the General Assembly, a vacancy shall happen in any office, the appointment to which is vested in the General Assembly; or when, at any time, a vacancy shall have occurred in any other State office, or in the office of Judge of any court; the Governor shall fill such vacancy, by appointment, which shall expire, when a successor shall have been elected and qualified.

§ 19. Election to vacancies in assembly.—He shall issue writs of election to fill such vacancies as may have occurred in the General Assembly.

§ 20. Change of meeting-place of assembly.—Should the seat of government become dangerous from disease or a common enemy, he may convene the General Assembly at any other place.

§ 21. Duties of lieutenant-governor. —The Lieutenant-Governor shall, by virtue of his office, be President of the Sen-

ate; have a right, when in committee of the whole, to join in debate, and to vote on all subjects; and, whenever the Senate shall be equally divided, he shall give the casting vote.

### Article 6

#### ADMINISTRATIVE

§ 7. Impeachment of state officers.— All State officers shall, for crime, incapacity, or negligence, be liable to be removed from office, either by impeachment by the House of Representatives, to be tried by the Senate, or by a joint resolution of the General Assembly; two-thirds of the members elected to each branch voting, in either case, therefor.

### Article 10

#### FINANCE

§ 1. Assessment and taxation.—The General Assembly shall provide, by law, for a uniform and equal rate of assessment and taxation; and shall prescribe such regulations as shall secure a just valuation for taxation of all property, both real and personal, excepting such only for municipal, educational, literary, scientific, religious, or charitable purposes, as may be specially exempted by law.

§ 2. Payment of public debt.—All the revenues derived from the sale of any of the public works belonging to the State, and from the net annual income thereof, and any surplus that may, at any time, remain in the Treasury, derived from taxation for general State purposes, after the payment of the ordinary expenses of the government, and of the interest on bonds of the State, other than Bank bonds, shall be annually applied, under the direction of the General Assembly, to the payment of the principal of the Public Debt.

§ 3. Appropriations.—No money shall be drawn from the Treasury, but in pursuance of appropriations made by law.

§ 4. Statement of receipts and expenditures.—An accurate statement of the receipts and expenditures of the public money, shall be published with the laws of each regular session of the General Assembly.

§ 5. State debt prohibited—Exceptions.—No law shall authorize any debt to be contracted, on behalf of the State, except in the following cases: To meet casual deficits in the revenue; to pay the interest on the State Debt; to repel invasion, suppress insurrection, or, if hostilities be threatened, provide for the public defense.

### Article 15

#### MISCELLANEOUS

§ 3. Holding over.—Whenever it is provided in this Constitution, or in any law which may be hereafter passed, that any officer, other than a member of the General Assembly, shall hold his office for any given term, the same shall be construed to mean, that such officer shall hold his office for such term, and until his successor shall have been elected and qualified.

§ 4. Official oath.—Every person elected or appointed to any office under this Constitution, shall, before entering on the duties thereof, take an oath or affirmation, to support the Constitution of this State, and of the United States, and also an oath of office.

### Article 16

#### AMENDMENTS

§ 1. How made.—Any amendment or amendments to this Constitution, may be proposed in either branch of the General Assembly; and, if the same shall be agreed to by a majority of the members elected to each of the two Houses, such proposed amendment or amendments shall, with the yeas and nays thereon, be entered on their journals, and referred to the General Assembly to be chosen at the next general election; and if, in the General Assembly so next chosen, such proposed amendment or amendments shall be agreed to by a majority of all the members elected to each

House, then it shall be the duty of the General Assembly to submit such amendment or amendments to the electors of the State; and if a majority of said electors shall ratify the same, such amendment or amendments shall become a part of this Constitution.

§ 2. Separate vote.—If two or more amendments shall be submitted at the same time, they shall be submitted in such manner, that the electors shall vote for or against each of such amendments separately; and while an amendment or amendments, which shall have been agreed upon by one General Assembly, shall be awaiting the action of a succeeding General Assembly, or of the electors, no additional amendment or amendments shall be proposed.

SCHEDULE

Effective date of constitution.—This Constitution, if adopted, shall take effect on the first day of November, in the year one thousand eight hundred and fifty-one, and shall supersede the Constitution adopted in the year one thousand eight hundred and sixteen.

General assembly.—Sixth. There shall be a session of the General Assembly, commencing on the first Monday of December, in the year one thousand eight hundred and fifty-one.

Legislators hold over.—Seventh. Senators now in office and holding over, under the existing Constitution, and such as may be elected at the next general election, and the Representatives then elected, shall continue in office until the first general election under this Constitution.

First general election.—Eighth. The first general election under this Constitution, shall be held in the year one thousand eight hundred and fifty-two.

Done in Convention, at Indianapolis, the tenth day of February, in the year of our Lord one thousand eight hundred and fifty-one; and of the Independence of the United States, the seventy-fifth.

APPENDIX B

(To Separate Opinion of Judge Holder)

AMENDMENTS TO THE CONSTITUTION OF STATE OF INDIANA

Article 2

§ 2. As amended in 1881.—In all elections not otherwise provided for by this Constitution, every male citizen of the United States, of the age of twenty-one years and upwards, who shall have resided in the State during the six months, and in the township sixty days, and in the ward or precinct thirty days, immediately preceding such election, and every male of foreign birth, of the age of twenty-one years and upwards, who shall have resided in the United States one year, and shall have resided in this State during the six months, and in the township sixty days, and in the ward or precinct thirty days, immediately preceding such election, and shall have declared his intention to become a citizen of the United States, conformably to the laws of the United States on the subject of naturalization, shall be entitled to vote in the township or precinct where he may reside, if he shall have been duly registered according to law.

§ 2. As amended in 1921.—In all elections not otherwise provided for by this Constitution, every citizen of the United States, of the age of twenty-one years and upwards, who shall have resided in the State during the six months, and in the township sixty days, and in the ward or precinct thirty days immediately preceding such election, shall be entitled to vote in the township or precinct where he or she may reside.

Article 4

§ 4. As amended in 1881.—The General Assembly shall, at its second session after the adoption of this Constitution, and every sixth year thereafter, cause an enumeration to be made of all the male inhabitants over the age of twenty-one years.

§ 5. As amended in 1881.—The number of Senators and Representatives shall, at the session next following each period of making such enumeration, be fixed by law, and apportioned among the several counties, according to the numbers of male inhabitants, above twenty-one years of age, in each: Provided, that the first and second elections of members of the General Assembly, under this Constitution, shall be according to the apportionment last made by the General Assembly, before the adoption of this Constitution.

## APPENDIX C

### (To Separate Opinion of Judge Holder)

### DIFFERENCE BETWEEN MALE & FEMALE INHABITANTS OVER 21 YEARS OF AGE IN EACH COUNTY

(plus means — excess women)
(minus means — excess men)

| County | 1930 Census | 1940 Census | 1950 Census | 1960 Census |
|---|---|---|---|---|
| Adams | minus 162 | minus 242 | plus 223 | plus 488 |
| Allen | plus 694 | plus 2927 | plus 4515 | plus 6333 |
| Bartholomew | minus 158 | 0 | plus 175 | plus 634 |
| Benton | minus 181 | minus 205 | plus 10 | plus 220 |
| Blackford | plus 16 | plus 71 | plus 248 | plus 371 |
| Boone | minus 231 | plus 62 | plus 504 | plus 828 |
| Brown | minus 212 | minus 332 | minus 106 | plus 16 |
| Carrol | plus 10 | plus 3 | plus 204 | plus 374 |
| Cass | plus 212 | plus 299 | plus 1134 | plus 1537 |
| Clark | plus 41 | plus 140 | plus 343 | plus 1137 |
| Clay | minus 36 | minus 88 | plus 327 | plus 753 |
| Clinton | plus 66 | plus 46 | plus 539 | plus 895 |
| Crawford | minus 188 | minus 202 | minus 74 | minus 24 |
| Davies | plus 27 | minus 104 | plus 392 | plus 747 |
| Dearborn | minus 242 | minus 366 | plus 146 | plus 376 |
| Decatur | minus 105 | minus 161 | plus 124 | plus 340 |
| DeKalb | minus 99 | minus 14 | plus 281 | plus 662 |
| Delaware | minus 896 | minus 281 | plus 1099 | plus 2457 |
| Dubois | minus 297 | minus 288 | minus 144 | plus 259 |
| Elkhart | plus 142 | plus 541 | plus 1555 | plus 2908 |
| Fayette | minus 377 | minus 237 | minus 3 | plus 458 |
| Floyd | plus 687 | plus 903 | plus 1060 | plus 1633 |
| Fountain | minus 135 | minus 219 | plus 89 | plus 240 |
| Franklin | minus 425 | minus 393 | minus 190 | plus 123 |
| Fulton | minus 77 | minus 200 | plus 243 | plus 370 |
| Gibson | plus 86 | minus 42 | plus 361 | plus 908 |
| Grant | minus 931 | minus 1337 | minus 401 | plus 348 |
| Greene | minus 332 | minus 353 | plus 256 | plus 675 |
| Hamilton | minus 26 | plus 24 | plus 317 | plus 741 |
| Hancock | minus 46 | plus 77 | plus 438 | plus 659 |
| Harrison | minus 263 | minus 422 | minus 293 | plus 109 |
| Hendricks | plus 82 | minus 69 | plus 128 | plus 522 |
| Henry | minus 447 | minus 203 | plus 475 | plus 1072 |
| Howard | minus 224 | plus 81 | plus 782 | plus 1454 |

| County | 1930 Census | 1940 Census | 1950 Census | 1960 Census |
|---|---|---|---|---|
| Huntington | plus 318 | plus 406 | plus 841 | plus 1371 |
| Jackson | plus 40 | minus 46 | plus 361 | plus 565 |
| Jasper | minus 347 | minus 390 | minus 255 | plus 42 |
| Jay | minus 15 | minus 214 | plus 264 | plus 626 |
| Jefferson | plus 28 | minus 27 | plus 277 | plus 580 |
| Jennings | minus 529 | minus 809 | minus 192 | plus 64 |
| Johnson | plus 22 | minus 22 | plus 422 | plus 821 |
| Knox | minus 111 | plus 9 | plus 938 | plus 1701 |
| Kosciusko | minus 60 | minus 209 | plus 339 | plus 663 |
| LaGrange | minus 122 | minus 180 | minus 47 | plus 309 |
| Lake | minus 21150 | minus 12490 | minus 7675 | minus 2070 |
| LaPorte | minus 3634 | minus 3578 | minus 2315 | minus 1075 |
| Lawrence | minus 253 | minus 141 | plus 398 | plus 954 |
| Madison | minus 1978 | minus 1101 | plus 290 | minus 2334 |
| Marion | plus 7132 | plus 12486 | plus 18977 | plus 25704 |
| Marshall | minus 243 | minus 83 | plus 201 | plus 634 |
| Martin | minus 284 | minus 325 | minus 167 | plus 3 |
| Miami | minus 453 | plus 48 | plus 542 | minus 242 |
| Monroe | minus 342 | plus 19 | minus 1205 | minus 220 |
| Montgomery | plus 282 | plus 257 | plus 436 | plus 757 |
| Morgan | minus 107 | minus 147 | plus 42 | plus 456 |
| Newton | minus 228 | minus 322 | minus 49 | plus 208 |
| Noble | plus 20 | plus 20 | plus 446 | plus 658 |
| Ohio | minus 27 | minus 53 | plus 42 | plus 78 |
| Orange | minus 311 | minus 310 | minus 183 | minus 65 |
| Owen | minus 129 | minus 173 | plus 1 | plus 165 |
| Parke | minus 255 | minus 184 | plus 73 | plus 136 |
| Perry | minus 155 | plus 8 | plus 25 | plus 290 |
| Pike | minus 182 | minus 198 | plus 123 | plus 197 |
| Porter | minus 480 | minus 643 | minus 494 | plus 152 |
| Posey | minus 203 | minus 209 | plus 144 | plus 504 |
| Pulaski | minus 236 | minus 281 | minus 121 | plus 94 |
| Putnam | minus 1083 | minus 1046 | minus 1157 | minus 425 |
| Randolph | plus 24 | minus 102 | plus 349 | plus 756 |
| Ripley | minus 365 | minus 517 | minus 170 | plus 247 |
| Rush | plus 46 | plus 84 | plus 211 | plus 507 |
| St. Joseph | minus 2457 | plus 166 | minus 186 | plus 4597 |
| Scott | minus 13 | minus 202 | plus 97 | plus 57 |
| Shelby | plus 171 | plus 66 | plus 545 | plus 825 |
| Spencer | minus 361 | minus 391 | minus 472 | minus 290 |
| Starke | minus 416 | minus 337 | minus 36 | plus 160 |
| Steuben | minus 178 | minus 210 | minus 715 | minus 176 |
| Sullivan | minus 3 | minus 146 | plus 350 | plus 759 |
| Switzerland | minus 139 | minus 65 | minus 19 | plus 95 |
| Tippecanoe | plus 775 | plus 866 | minus 2426 | minus 378 |
| Tipton | minus 46 | minus 66 | plus 150 | plus 376 |
| Union | plus 27 | minus 75 | plus 18 | plus 115 |
| Vanderburgh | plus 2344 | plus 3222 | plus 5471 | plus 7657 |
| Vermillion | minus 566 | minus 381 | plus 151 | plus 437 |
| Vigo | plus 1009 | plus 2081 | plus 2107 | plus 3385 |
| Wabash | plus 197 | plus 37 | plus 554 | plus 919 |

| County | 1930 Census | 1940 Census | 1950 Census | 1960 Census |
|---|---|---|---|---|
| Warren | minus 276 | minus 227 | minus 115 | plus 62 |
| Warrick | minus 207 | minus 219 | plus 184 | plus 474 |
| Washington | minus 170 | minus 240 | plus 25 | plus 248 |
| Wayne | plus 436 | plus 797 | plus 1743 | plus 2339 |
| Wells | minus 132 | minus 44 | plus 223 | plus 494 |
| White | minus 161 | minus 291 | plus 78 | plus 316 |
| Whitley | minus 142 | minus 201 | plus 33 | plus 377 |

## APPENDIX D

### (To Separate Opinion of Judge Holder)

### DISTRICT "B"

| County | Male | Female | Total |
|---|---|---|---|
| Noble | 8,024 | 8,682 | 16,706 |
| Allen | 65,317 | 71,650 | 136,967 |
| DeKalb | 8,061 | 8,723 | 16,784 |
| Whitley | 5,989 | 6,366 | 12,355 |
| Adams | 6,789 | 7,277 | 14,066 |
| Wells | 6,102 | 6,596 | 12,698 |
| Huntington | 9,622 | 10,993 | 20,615 |
| Steuben | 5,384 | 5,208 | 10,592 |
| LaGrange | 4,563 | 4,872 | 9,435 |
| Kosciusko | 11,766 | 12,429 | 24,195 |
| Wabash | 9,184 | 10,103 | 19,287 |
| Marshall | 9,224 | 9,858 | 19,082 |
| Total | 150,025 | 162,757 | 312,782 |

### DISTRICT "A"

| County | Male | Female | Total |
|---|---|---|---|
| Lake | 147,693 | 145,623 | 293,316 |
| SUMMARY: | | | |
| District "B" | plus 2,332 | plus 17,134 | plus 19,466 |

MAJORITY RESPONSE:

The majority of the Court is opposed to reaching out for an issue upon the constitutionality of Sections 4 and 5 of Article 4 of the Indiana Constitution of 1851. The issue was not presented by the parties. No testimony or arguments were heard upon the issue, and no briefs were filed with respect to it. Judge HOLDER'S separate opinion in our view has not a sufficient basis in the record before us.

The declaration of any part of the Indiana Constitution unconstitutional as violating the United States Constitution is as much a question of "great gravity

and delicacy" as the late Justice Brandeis said, in Ashwander v. Tennessee Valley Authority, 297 U.S. 288, 56 S.Ct. 466, 80 L.Ed. 688, of the question of the constitutionality of an Act of Congress. In that case Justice Brandeis laid down guidelines for testing constitutionality of an act. These tests are relevant here, even if we assume that the question had been raised and argued and briefed. Among the tests laid down were that the court should not anticipate the constitutional question in advance of the necessity to decide; nor upon complaint of one who fails to show that he is injured by its operation.

These tests are missing here. The question is being anticipated by Judge HOLDER at this point: No female has claimed in these actions that male enumeration is invidious discrimination. And, of course, Sections 4 and 5 do not interfere with the females' right to vote guaranteed by the nineteenth amendment of the Constitution of the United States. The sections deal only with enumeration as a basis for apportionment.

Even though this court should pass over the objection that the test is not met on this record, the court should not in any event go beyond giving the parties an opportunity, if not to litigate the issue of unconstitutionality in their own interests, then to enlighten the court in its interests.

The record before us is insufficient upon which to justify deciding the question raised by Judge HOLDER. It is a *constitution* that he is making a judgment upon. It is unnecessary now to do so since the invalidity of the 1921 apportionment statutes is a sufficient basis for the relief being granted at this time. The majority will, in due time, when the Court considers what further relief may be granted, order the parties to a full dress briefing and argument on the constitutional question in order that a decision on the question may be given thorough consideration by the Court.